## GEO. HOWARD STIRLING et al. *vs.* JAMES L. Mc-LANE et al.

*Mortgage Sale—Mode of Offering Property.*

Exceptions to the ratification of a mortgage sale of a tract of land containing fifty-four acres, improved by a dwelling-house and outbuildings, alleged that the land was sold as an entire tract whereas it should have been offered in small lots, and that if it had been so offered a much larger price would have been obtained and it would not have been necessary to sell all the land in order to pay the mortgage debt. The evidence examined and held not to support these allegations and consequently the order overruling the exceptions and ratifying the sale is affirmed.

Appeal from the Circuit Court for Baltimore County (VAN BIBBER, J.)

The cause was argued before McSHERRY, C. J., BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*T. Scott Offutt,* for the appellants.

*George Whitelock* and *Edgar Allan Poe* (with whom were *W. Hall Harris* and *H. Oliver Thompson* on the brief), for the appellees.

PEARCE, J., delivered the opinion of the Court.

The appeal in this case is from an order of the Circuit Court for Baltimore County, as a Court of equity, overruling exceptions to the ratification of a sale of mortgaged premises made under a decree of said Court, and finally ratifying said sale.

The mortgage debt was $16,000, with interest due at time of sale for eleven months, and the State and county taxes for 1903 and 1904 were also due and unpaid, all aggregating near $17,250. And the mortgaged premises comprised fifty-four aces of land situated in the Green Spring Valley in Baltimore County on the Garrison Forest road, improved by a good dwelling-house, gardener's house, barn and other outbuildings. The decree was passed April 26th, 1905, appointing H. Oliver Thompson and George Whitelock, trustees to sell, the terms of the sale being one-third cash, one-third in six months, and one-third in twelve months, or all cash at the purchaser's option; the decree also authorized the trustees to report to the Court in their discretion any offer received for the purchase of the property or any part thereof, and pending sale, to rent the property or any part thereof in their discretion. The trustees advertised the property according to the requirements of the decree, and on May 29th, 1905, at the Court House door in Towson, sold the same as a whole to James L. McLane, the highest bidder therefor, for the sum of nineteen thousand dollars. Eight judgment creditors of the mortgagors were made parties defendant to the proceedings, whose claims aggregated near $6,000, but none of these joined in the exceptions filed by the mortgagors, George Howard Stirling and Mary Stirling, his wife, nor filed any exceptions in their own behalf. The exceptions of the mortgagors were:

1st. That the price obtained was grossly inadequate..

2nd. That it was offered only as a whole and so sold, whereas it was susceptible of division into smaller tracts or parcels, and if so divided, the several parcels could have been advantageously sold, and a much larger price realized.

3rd. That it should have been sold on the premises in the vicinity of which resided most of those likely to become pur-

chasers for such property, and that Towson was an inconvenient place for many who desired to attend the sale.

4th. That the plat shown by the trustees at the sale was defective and misleading, and did not give purchasers a fair impression of the property.

5th. That the sale was badly announced, as persons who were in attendance were not clearly informed that it was taking place, or what was being sold.

6th. That more land was sold than was necessary to pay the mortgage debt and costs, and

7th. That the sale was not made in accordance with the requirements of the decree.

Considerable testimony was taken, but it related exclusively to the objection that the tract should have been subdivided, and offered in parcels before offering it as a whole. This testimony of course indirectly involves the consideration of the first and sixth exceptions, relating to the inadequacy of price, and the sale of more land than was necessary, but there was absolutely no testimony tending to sustain the other exceptions, the plat shown by the trustees at the sale not even being included in the record or alluded to, and these exceptions therefore need not be considered.

It has been settled by repeated decisions in this State that "a trustee is bound, for the protection of the interest of all the parties concerned, to bring the property into the market in such manner as to obtain a fair market price; he must exercise the same degree of judgment and prudence that a careful owner would exercise in the sale of his own property, and in doing that he should consider the best mode of offering the property, not only as to whether it was advisable to offer it in lots or parcels, but also as to the proper location and outlines of each parcel." *Carroll* v. *Hutton*, 88 Md. 679; *Thomas* v. *Fewster*, 95 Md. 449, and cases there cited. These principles are founded in justice and humanity, and their application has been not infrequently required, to restrain the careless exercise or abuse of authority, and sometimes the malevolence or rapacity of its possessor. But as was said in *Bank of Com-*

*merce* v. *Lanahan, trustee*, 45 Md. 410: "Bad faith or negli-
gence on the part of the trustee will not be presumed, but, on
the contrary, the presumption is that he has discharged his
duty faithfully, and that presumption prevails until it is made
to appear otherwise by those seeking to impeach the sale.
Sales like the present are not to be impeached by slight cir-
cumstances.    It requires good and substantial grounds to jus-
tify the Court in setting them aside, when regularly made; for
otherwise all confidence in their performance and security
would be destroyed, and the public would be loth ever to bid
for property thus offered.    Where a stranger or third person
becomes the purchaser in good faith, something more than a
mere offer of a higher price must appear to induce a resale;
such as fraud or misconduct of the master, or other person
having the control of the sale, or surprise upon the party
interested, or his having been misled as to the time and place
of sale."

It is in the light of these principles that the evidence ad-
duced in cases of this character must be considered.

Several witnesses were examined for the exceptant.    Of
these, Mr. Disney was a surveyor of large experience, who
was familiar with this property, and who, *subsequent to this
sale*, at the request of the mortgagor, Mr. Stirling, subdivided
this tract into seven parcels.    He testified that in his opinion
the tract should have been offered in parcels as shown in the
accompanying plat, and that a much better price could have
been thus obtained than by a sale as a whole.    Under his
plan of division, Lots 4, 5, 6 and 7 front on Garrison Forest
road an improved public highway, and contain respectively
4¼, 7½, 4¾ and 1½ acres, No. 5 being improved by a
commodious dwelling and good outbuildings, and No. 4 hav-
ing on it a suitable house for a gardener and a barn.    Lot No.
3 contains 10½ acres, lies in the rear of Lots 4, 5, 6 and 7
with a narrow front on a road leading from Garrison Forest to
Chattolanee.    No. 2 contains 10½ acres, all woodland, ad-
joins no road whatever, and has no outlet except over a pro-
posed right of way running over Lot No. 3 for its whole

length, and connecting with the Chattolanee road just men-
tioned. No. 1 contains 13½ acres, adjoins No. 2, but adjoins
no road, and is reached by a private road belonging to Mr.
Stirling, now constructed between the Baldwin and Oliver
properties shown on the plat, for the use of the Thompson
property, and reserved, but not yet constructed over the
Thompson poroperty up to the line of Lot No. 1. There are no
improvements on Lots 1, 2, 3, 6 and 7. Upon Lot No. 2
there is a large spring upon which the buildings upon Lots 4
and 5 depend for their water supply.

Upon cross-examination Mr. Disney said that upon the
Reistertown pike, near the extreme western end of the Green
Spring Valley, people asked for small lots, but he admitted
that in the immediate vicinity of this property and generally
in that part of the valley, he knew of no demand for small
lots; that most of the residents were large holders of land,
and instead of selling off lots were adding to their holdings.
The testimony showed that this is due to the fact that in that
section of the valley most of the land is owned and occupied
as residences by persons of large wealth, who either do not
care to sell at all, or who refuse to sell except to those whom
they regard as desirable acquisitions to the social colony which
has been established there. It is obvious that these consider-
ations must discourage and operate to deter persons of mod-
erate means from settling in that immediate neighborhood,
and must tend to limit competition among purchasers to those
who can afford to hold large areas of unimproved land, until
there is a demand for it from those of equal wealth. Mr.
Disney was asked if his subdivision of this property was made
to meet any present demand for small lots, and his answer
was, "not that, but to fix it for people to come in that neigh-
borhood," and when asked if this was not in the nature of an
experiment, he replied, "I would like to see the experiment
tried."

Mr. Linton, a broker of some experience, and acquainted
with that neighborhood, thought it was bad judgment to offer
the fifty-four acres as a whole, and said that in his opinion,

Lot 1 ought to bring at a forced sale $2,700; Lot 2, $3,000; Lot 3, $3,000; Lot 4, $3,000; Lot 5, $10,000; Lot 6, $2,000; Lot 7, $1,000; aggregating $24,700.   He said that in the fall of 1904 he had offered Mr. Stirling $17,000 for Lots 3, 4, 5, 6 and 7 with the right to use the spring on Lot 2 for an unlimited water supply to Lots 3, 4, 5, 6 and 7, but without any right of way for Lot 2 over Lot 3 as shown on Mr. Disney's plat.   It will be observed that this offer is $2,000 less than the valuation put by him on these lots as separate parcels, without the valuable water rights required in his offer, and free from the right of way for Lot 2 over Lot 3.   How much the value of Lot 2 would be diminished by the imposition of these water rights as affecting the safety of the supply for Lot 2 and by leaving it without any outlet to a highway, does not appear from the testimony, but it is plain that purchasers would take it into serious account, and when a reasonable deduction is made from Lot 2, for that reason, there would remain a small margin only between Mr. Linton's aggregate valuations and the price obtained at the sale.

Mr. Shirk, another real estate broker of experience, and acquainted with the property, gave it as his opinion that Mr. Disney's subdivision was a good one, and that the property would have brought more money if so offered.   His opinion of the market values of these parcels is widely different from Mr. Linton's.   He valued Lot 1 at $5,400, Lot 2 at $4,200, Lot 3 at $4,200, Lots 4, 5 and 6 together, not including the value of the buildings, $6,600, and Lot 7, $375; aggregating $20,775.   He estimated the value of the buildings, apart from the land, at $13,800, which if added to the estimated value of the land alone, would amount to $34,500; but it is unnecessary to say that this mode of estimation cannot be accepted as a safe basis of the market value of land and improvements together.

Mr. Elder, a resident of the Green Spring Valley, and a land owner, thought that the dwelling with Lots 3, 4, 5, 6, and 7, should have been offered together and ought to bring about $18,000, and that the residue was worth from $200 to

$250 per acre at forced sale, and that it was not susceptible of advantageous division into more than two or at most three parcels. This would give a total valuation of abont $23,500.

On the other hand, Mr. Graham, a real estate broker of thirty years' experience, and familiar with the neighborhood, said that larger property was more in demand there; that most of the sales were in tracts from 50 to 100 acres, and that many persons there were increasing their purchases; that this was a very difficult piece of property to divide on account of the shape and lay of the land, and the necessity for rights of way to some of the parcels, and that in his opinion it would not be advantageous to offer that tract in parcels.

Mr. Marriott, another experienced real estate broker who knew this property, said that there is a wealthy class of people there, and a demand for tracts of 25 to 50 acres; that there was no demand there for lots of the size shown upon Mr. Disney's plat; that in his opinion that tract was more valuable sold as a whole than in parcels, and that the price obtained by the trustees was a fair market value.

Mr. Whitelock, one of the trustees, who especially represented Mr. Stirling as his counsel before the decree was obtained, said that this property had been advertised about a year before under the first mortgage, and that sale was stayed by the assignment of that mortgage, and the creation of a third mortgage, to accomplish that purpose; that this third mortgage was pressing, and he advised Mr. Stirling to the plan under which sale under a decree was provided for, instead of under the power in the mortgage; that he told him this decree would provide for a private sale of the whole or a part, if such could be effected, and for leasing the property if this could be done to advantage; that this arrangement was made to give Mr. Stirling more time to effect a private sale; that when the trustees advertised, they did so to anticipate an advertisement under the third mortgage which was threatened; that they examined and adopted the advertisement prepared for the proposed previous sale, which they had reason to believe was a safe guide to them; and that he told Mr. Stirling

he had not a moment to lose in his efforts to sell; that he and his co-trustee, Mr. Thompson, discussed the advisability of offering as a whole and in parcels, and determined from their information that it was useless to offer in parcels; that the day after the advertisement appeared, Mr. Stirling came to see him and said he thought it better to advertise in lots, but that this was the first time he had mentioned that question; that he told Mr. Stirling he did not think so, but he would see Mr. Thompson on the subject; that he did so, and Mr. Thompson reported that he thought it better to offer it as a whole; that they also discussed the place of sale and concluded it was best to sell at Towson where most trustees sales are made, for that reason, and because the train service to Towson was quicker and more frequent; and that there was no offer for the property or any part made to him at any time, though Mr. Stirling came to see him almost every day and reported that he had seen different persons who would probably make an offer; that when the property was sold Mr. Stirling wished the trustees to withdraw it, but that upon consultation they felt they could not properly do so, and told Mr. Stirling that they thought the withdrawal the year before was the cause of the small attendance at that time, and that if it was then again withdrawn, it would prejudice any future sale.

Mr. Thompson, the other trustee, corroborated the testimony of Mr. Whitelock in every particular. He stated that there were four persons who made inquiries respecting the property, of whom Mr. McLane was one, and that he gave the names of all these parties to Mr. Stirling that he might communicate with them, but that he received no offer from any one, and no inquiry was made by any broker or other person, as to the subdivision of the property, until Mr. Stirling spoke to him on that subject on May 24th, five days before the sale, when he informed him the trustees had considered this, and had determined it was useless.

We have reviewed the testimony at this unusual and perhaps unnecessary length, in order to make it clear that we have given careful consideration to the ground of these excep-

tions. If we could be satisfied that this property was sold for a clearly inadequate price by reason of the failure of the trustees to offer it in parcels, and that if now so offered, there would be a reasonable expectation of obtaining an adequate price, we should sustain the exceptions, and order the property to be reoffered in parcels. But we are by no means convinced that the trustees were in error in their judgment as to the method of sale, and we have no reasonable assurance that a better price could be obtained at a resale, even if offered in parcels.

The testimony shows that Mr. Stirling had for more than a year before the sale been endeavoring to sell the property, either as a whole or in parcels, but without success, and that the only offers he had were from Mr. Linton, who offered $17,000 for 27 or 28 acres with all the improvements and the use of the spring on the other part of the property, or $20,000 for the whole property; that he had no offer or inquiry for Lots 1 and 2 at any time, and that he never requested that it be offered in parcels until after the advertisement appeared, and then gave the trustees no reasons for expecting any benefit from such offering. Messrs. Linton and Shirk both testified that they made repeated efforts as real estate brokers to aid Mr. Stirling in effecting a sale, and solicited other brokers to aid them, but without result. Mr. Linton did not attend the sale, and did not renew his private bid for the whole, nor request the trustees to offer separately the part for which he had privately bid $17,000. If this property really had the inherent value for purposes of subdivision which Mr. Linton and Mr. Shirk have attributed to it, its sale as a whole offered special inducements to that class of speculative purchasers who are alert for such opportunities, and with whom real estate brokers usually have a business acquaintance; but no such prospective purchasers appeared at this sale. On the contrary Mr. Marriott himself, a real estate broker, testified that he would have bought it himself "if he could have looped it off and made money out of it," but that he did not think it would bring more than it sold for.

Moreover it is a significant fact that none of the lien cred-itors of Mr. Stirling whose claims aggregate $6,000, and who would be the beneficiaries of any advance upon a resale, have united in these exceptions.

In *Bank of Commerce* v. *Lanahan, supra*, the Court said: "In regard to the saleable value of property there is always more or less diversity of opinion, even among those who are supposed to be competent judges. Every controverted case in regard to the value of property exemplifies the truth of this remark. But with all the diversity of opinion upon this sub-ject, no witness ventures to say that he will give more than the bid reported, if the property goes to resale, and there is nothing in any portion of the evidence that gives any degree of assurance that, if the property were put up at resale, it would bring more than the price reported. Why then order a resale? The sale reported should not be set aside, and a resale ordered as a mere *experiment*. That is forbidden both by reason and the well established doctrine of the law upon the subject." In *Wickes* v. *Westcott*, 59 Md. 281 and 282, where there was great diversity of opinion among the wit-nesses as to the saleable value of the land one of the controll-ing considerations with the Court in ordering a resale, was the statement of a judgment creditor of the mortgagor that if fuller information had been given as to the incumbrances on the property, he would have bid more than the price reported, and that his purpose was to advance upon that price upon a new offer of the property. Here there is no such condition and no circumstances which can warrant us in venturing now upon the experiment which Mr. Disney wished to see tried at the sale reported.

For these reasons we cannot sustain these exceptions.

*Order affirmed with costs to the appel-lee above and below.*

(Decided February 13th, 1906.)