LENNOX B. CLEMENS, TRUSTEE, *v.* UNION TRUST
COMPANY, ET AL.

[No. 36, April Term, 1936.]

*Decided June 9th, 1936.*

522

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Joseph J. Rehm,* for the appellant.

*William L. Rawls* and *Charles Ruzicka,* with whom were *James B. Diggs* and *Brown & Brune* on the brief, for the appellees.

MITCHELL, J., delivered the opinion of the Court.

The appeal in this case is from an order passed by the Circuit Court of Baltimore City on the 7th day of November, 1935, dismissing an amended bill of complaint filed by Lennox B. Clemens, trustee, the appellant, against the Union Trust Company of Maryland, a corporation, Charles Ruzicka and James B. Diggs, trustees, and the Royal Realty Corporation, appellees.

The amended bill of complaint, in substance, alleges that prior to January 27th, in the year 1931, the appellant was indebted to the trust company for unsecured loans aggregating the sum of $71,000, and that on said date negotiations between the appellant and the trust company resulted in the execution of a mortgage from the former to the latter, securing, to the extent of the value of the property therein described, said prior indebtedness. The mortgage was duly recorded. Its preamble recites the authority of the mortgagor, as trustee under the will of Mary Clemens, to execute the same; a loan of $71,000, as of the date of the mortgage, to be paid, with interest in the meantime, half-yearly, at the rate of six per cent. per annum, in one year from date of the mortgage; and further recites the execution and delivery of a ne-

gotiable promissory note of even date, by the mortgagor to the mortgagee, for the principal of said loan and the interest to accrue thereon, payable in one year from date at the same rate of interest. The mortgage covered two unimproved lots or parcels of land, located within the limits of the City of Baltimore, and particularly described therein, which, according to the testimony of the appellant, contain in the aggregate thirty-five acres, and are susceptible of development as a desirable residential section. Among the terms and conditions of the mortgage which more particularly bear upon the instant case, are the following:

(a) The usual provision that upon default being made in any covenant or condition of the mortgage, then the whole mortgage debt thereby secured shall be deemed due and payable forthwith, whereupon it shall be lawful for the mortgagee, its successors and assigns, or its attorney or agent, "to sell at public auction, the property hereinbefore described, in whole or separate parcels at the option of the party selling, according to the provisions of article 66 of the Code of Public General Laws of this State, * * * which sale shall be made upon the following terms, viz.: all cash upon ratification of the sale, or such other terms as the party selling may deem expedient."

(b) Provision declaring the assent of the mortgagor to the passing of a decree for the sale of the mortgaged property "in whole or separate parcels at the option of the party selling," in accordance with the general provisions of the Code relating to mortgages in the city of Baltimore.

While the mortgage, as hereinbefore indicated, recites a contemporaneous loan, the appellant by his own testimony establishes the fact that it was given to secure a previous existing indebtedness, and that a check for the amount of the mortgage, passed to him by the mortgagee on the day of the transaction, was forthwith indorsed and redelivered to the mortgagee in settlement of said prior indebtedness.

Notwithstanding, as will be hereinafter observed, that our conclusion in the main is based upon the general principle that, in the absence of fraud, final ratifications should not be disturbed through collateral attack, we deem it expedient to review the undisputed facts as revealed by the record, and supported by the testimony of the appellant himself. These facts are as follows:

(a) That the appellant at the time of executing the mortgage, and at the time of its foreclosure, was a member of the Baltimore City Bar, and actively engaged in the real estate business.

(b) That nothing was ever paid by the mortgagor, or on his behalf, upon said mortgage, and that taxes and assessments for the years 1931, 1932, 1933, and 1934 were permitted by the mortgagor to accumulate, resulting in imminent danger of a sale of the mortgaged property under tax proceedings by the City of Baltimore. It may be added that the aggregate of these taxes, including interest and penalties, was the sum of $4,590.08, and that they were paid solely by the mortgagee, as late as September 29th, 1934. Furthermore, the mortgagee, as early as April 17th, 1933, wrote the mortgagor calling the latter's attention to his previous promise that the then existing taxes would be paid; and the mortgagor, replying thereto on the following day, asked for further extension, assuring the mortgagee of an arrangement with the city tax authorities to protect the property from the danger of a tax sale, and that every effort was being made to pay the taxes at as early a date as possible.

(c) The total assessment of the mortgaged property, for state and city tax purposes, is shown to be $33,340.

Briefly, except as to the actual payment of the taxes by the mortgagee, such was the status of the transaction between the mortgagor and the mortgagee, when, on or about the 20th of July, 1934, the mortgagee instituted foreclosure proceedings upon the mortgage, in the Circuit Court of Baltimore City. On said July 20th, 1934, the mortgagor wrote the trust company to the effect that he had noted from the Daily Record that the company

had instituted said proceedings, requesting that if the company contemplated immediate advertisement of the property covered by the mortgage, it defer action until Mr. Hopkins, his attorney, who was handling the matter for the mortgagor, returned from his vacation, in order that an opportunity would be furnished the mortgagor and his attorney to discuss the situation with the mortgagee. On the following day the trust company, replying to the foregoing letter, requested information as to when Mr. Hopkins would return, and advised the mortgagor that it did not feel warranted in continuing the mortgage in question, because of the large amount due for taxes and interest.

Nothing further appears to have transpired between the parties in this matter until about the first part of the month of September, when Mr. Hopkins returned to the city, and, according to the testimony of the appellant, the following took place: "Q. I wish you would tell the court what, if anything, transpired after you received that letter from the Union Trust Company, dated July 21, 1934? A. Nothing, until Mr. Hopkins came back to town. Q. Then what took place? A. That was about the first part of September. He made an appointment with the Union Trust Company, Mr. Dunn, of the Union Trust Company, to discuss the matter, and, before attending the conference, Mr. Hopkins and I talked it over, and we decided we could not do anything, except give them a deed for the property—they had refused additional security prior to that time, and there was nothing further we could do. Mr. Hopkins called Mr. Dunn up in my presence, and told him we would not attend the conference, that we could not do anything further."

About six weeks after this conversation, the property was advertised in the Daily Record, a journal of many years' standing, principally devoted to the publication of legal notices and proceedings of the state and city courts, and circulated mainly among lawyers, realtors, and generally those interested in legal matters, especially public sales of real estate. The advertisement was in-

serted at least five times during the period of four weeks preceding the sale; and the sale took place on November 21st, 1934, according to the advertisement, at 1:15 o'clock p. m., by public auction at the Real Estate Board rooms, the situs of numerous like sales. The property was sold to the Royal Realty Corporation, one of the appellees, for the sum of $20,000; and on the same day the sale appears to have been reported to the court by Charles Ruzicka and James B. Diggs, the trustees theretofore appointed to make said sale, being finally ratified and confirmed by the court on the 26th day of November, 1934.

Following the ratification of the sale, an audit of the proceeds thereof was made by the auditor of the court and filed in the proceedings on January 3rd, 1935, showing a deficit of $64,420.58; which report was finally ratified by the court, without exception, on January 15th, 1935. On the latter date a motion for a deficiency decree *in personam* for the said sum of $64,420.58 was made on behalf of the trust company, and a subpœna was thereupon issued to be served upon the appellant, to show cause why such decree should not be passed. This subpœna appears to have been returned *non est;* but a subsequent subpœna was served upon the appellant, and the motion for a deficiency decree is apparently yet pending in the lower court.

It is contended by the appellant that, notwithstanding the procedure hereinbefore detailed, he was entirely ignorant of the sale of the property until on or about January 28th, 1935; but it is admitted by him that during the interval following the date when, through his counsel, he notified the trust company that he could do no more than convey the property, he took no steps to inform himself of subsequent developments, and that he was a subscriber to the Daily Record. Without commenting upon this unusual circumstance, we will now proceed to detail the reasons set forth in the amended bill of complaint for attacking the final ratifications of the sale, and the auditor's report thereon.

First, they are designed to contest the sale because

of the manner in which it was advertised, although the advertisement was inserted in accordance with the decree of the court which appointed the trustees to make the sale. That decree, passed on July 17th, 1934, empowered the trustees "to make the said sale, having given at least three weeks notice by advertisement inserted in such daily newspaper or newspapers published in the City of Baltimore as they shall think proper, of the time, place, manner and terms of sale"; and as hereinbefore stated, the several advertisements appearing in the Daily Record covered a period of more than three weeks.

It is further contended by the appellant that a lack of discretion was exhibited by the trustees in their failure to post a notice of the sale upon the mortgaged property; that the sale should have been held thereon, instead of in the Real Estate Board rooms; that no personal notice of the sale was served upon the mortgagor; that the advertisement of sale fixed 1:15 o'clock p. m. as the time at which it was to be made, whereas the property is reported to have been sold at 1 o'clock p. m.; that the purchaser was a subsidiary corporation or real estate holding company of the mortgagee; that the purchase price for the property was grossly inadequate; the failure of the appellant to receive notice of the filing of the auditor's account; that the trustees designedly refrained from seeing that the sheriff served the writ of subpœna directed to the appellant, following the motion of the trust company for a deficiency decree; and, generally, that through an unfair arrangement between the mortgagee, the purchaser, and the trustees, a fraud was practiced upon the mortgagor.

In dealing with these several matters, it should be borne in mind that the proceedings now before us represent a collateral attack upon the final ratifications of the sale and the auditor's report, as distinguished from exceptions to the sale and auditor's report; and that while a judicial sale and auditor's report, before ratification, may be successfully contested upon matters of irregularity, such matters, after ratification, ordinarily

form no basis for collateral attack, unless they are interwoven with fraudulent designs.

In *Jones on Mortgages* (8th Ed.), sec. 2137, it is stated: "After a confirmation of the sale and final decree, on application to set aside the sale, decree of confirmation and final decree, reasons founded on irregularities in making the sale are not available, unless a sufficient excuse is shown for failure to present such reasons in opposition to the application to confirm the sale. In general it may be said that objections to a sale based upon errors in the proceedings or in the decree will not be considered."

Considering the several criticisms of the manner in which the sale in this case was conducted, and passing for the moment the patent fact that they each concern matters which, in the absence of fraud, should have been raised by exceptions duly filed prior to the passage of the respective orders finally ratifying the sale and the auditor's report, do they mount up to that degree of irregularity which would justify a court of equity in annulling the final ratifications by the lower court?

The record shows that the advertisement inserted in the Daily Record was captioned, in large display type, "Trustees' Sale of Valuable Fee-Simple Unimproved Property, Suitable for Development, Situate on the North Side of Northern Parkway, East of York Road"; and in regular type, a full and particular description of the property, by metes and bounds, courses and distances, is given. While the mortgage provides for a cash sale, in the discretion of the party selling, upon final ratification, or such other terms as such party may deem expedient, the terms under which the property was advertised are one-third cash, one-third in six months, and one-third in twelve months from date of sale.

It was said in *Kres v. Hornstein,* 161 Md. 1, 155 A. 171, 173: "The Daily Record is a most valuable medium of reaching professional bidders. But, in order to reach the general public, most prudent owners would at least insert a short notice in a paper of wider circulation,

giving the attractive features of the property and referring to the more extended description in the Daily Record. We have noted a practice of this sort in a number of cases. We are not to be understood, however, as holding that a failure to do this would in itself be a sufficient ground for setting aside the sale."

In that case exceptions were raised to the ratification of the sale; and the propriety of its conduct involved the serious discrepancy of failing to disclose in the advertisement that an improvement upon the property, described as a "two-story building with store front," was in fact a large brick warehouse under a five-year lease at an annual rental of $2,000, with an option to the tenant to renew the lease for an additional five years at an annual rental of $2,400. This court properly reversed the action of the lower court in dismissing the exceptions and ratifying the sale.

It may be stated that the facts in each particular case are controlling, and that no inviolate rule can be invoked as a standard method of advertising public sales. Usually the procedure is prescribed in the decree of the court under the jurisdiction of which the sale is made, and, as in the instant case, discretion as to the newspaper in which the sale is advertised is lodged in the party designated to make the same. The Daily Record is a recognized legal medium circulating in Baltimore City, and throughout the state. It is the same publication which the appellant testifies he has used for the advertisement of public sales, as an attorney and realtor; and as has been stated, he subscribes to it. That he did not observe the advertisement, during a period when, because of his own ultimatum to the mortgagee, and his prior default in the payment of either interest, principal, or taxes, he had every reason to expect the mortgaged property to be advertised in some one or more Baltimore publications, may from his own viewpoint be now considered unfortunate; but we cannot agree that such circumstance warrants his conclusion that the trustees making the sale

designedly conspired to conceal any step in the fore-
closure proceedings from him or from any one.

The same reasoning applies to the failure to post notice
of sale upon the mortgaged premises. In *Chilton v.
Brooks,* 69 Md. 584, at page 588, 16 A. 273, 274, a case
in which exceptions to the ratification of a mortgage sale
were sustained, it was said: "It was proved that there
was a custom among auctioneers in the city to place
notices upon the doors, or in the windows, of houses for
sale, stating the time and place of sale; but the non-
observance of this custom, though a very good one, would
not, in our opinion, be sufficient to set aside a sale made
under a mortgage like this."

From what we have said with reference to the admitted
knowledge on the part of the mortgagor, both as to the
unsatisfactory status of his loan and the pending fore-
closure proceedings against him, it seems unnecessary
to dwell upon the failure of the trustees to serve him with
personal notice of the sale. There was no provision in
the mortgage requiring such notice, and it is apparent
that information as to the time and place of sale was
easily available at all times to him.

Nor do we hold that it is incumbent upon a trustee
to supervise the service of subpœnas by the sheriff. The
latter is a bonded officer of the court, and answerable
to it; and the order directing the clerk to issue the writ
of subpœna, the purpose of which was to warn the appel-
lant to show cause, if any, why a deficiency decree *in
personam* against him should not be entered, as well as
the service of the writ by the sheriff in pursuance of the
order, were matters peculiarly under the control of the
court—not the trustees.

Likewise the alleged failure of the appellant to receive
a posted notice of the filing of the auditor's report cannot
be successfully urged as a reason for annulling the final
ratification of the audit. Rule 15 of the lower court,
as found in the record, expressly provides that such notice
be posted by the auditor on the same date on which the
audit is filed, to every party to the course, or his solicitor,

and also to the mortgagor in cases of sales of mortgaged property. But it is significant that the same rule further provides that: "No proof of the sending of such notices shall be necessary to the ratification of the account, and failure to send them shall not be ground for reopening it." In view of this latter provision of the rule, further discussion of this phase of the appeal seems unnecessary.

We come now to the more important question before us, as urged in the appellant's brief, regarding the actual time at which the sale of the mortgaged property took place. The advertisement is shown by the record to have fixed the hour of sale at 1:15 o'clock p. m. on Wednesday, November 21st, 1934, and in the report of sale, as made by the trustees, it is set forth that "said trustees did, pursuant to said notice, on Wednesday, the 21st day of November, 1934, at one o'clock p. m., attend at the sales room of the Real Estate Board, and then and there sold said property." It will therefore be observed that there is an apparent variance of fifteen minutes between the time as advertised, and the time noted in the report of sale; but it will also be seen that the phraseology used in the report is susceptible of the construction that the trustees *attended* at the sales-room of the Real Estate Board at 1 o'clock p. m., and later conducted the sale; or, in other words, that the designation "one o'clock," as used in the report, relates to the exact time at which the trustees arrived at the salesroom of the Real Estate Board, rather than the time at which they actually conducted the sale. In 16 *R. C. L.* 47, it is stated: "The directions of the decree as to the time of sale should be strictly adhered to, and there can be little question but that a judicial sale at a time other than that lawfully appointed is invalid and will be vacated or refused confirmation where the irregularity is suggested to the Court *at the proper time.* Sales have accordingly been declared void because they were held from one to several days in advance of or subsequent to the appointed date. And the same result was reached where the sale was held a *few minutes* before the hour set, it appearing that the

selling price was inadequate, *and that other persons who had intended to bid came after the sale."*

We affirm the aforegoing summary of this principle of equity in every respect, and are unwilling to vary from it. Sound public policy demands that public judicial sales should be held at the exact time and place designated in the advertisements thereof. To permit the conduct of such sales at a time and place other than that so designated, would both invite and encourage collusion between dishonest sellers and purchasers, and result in injustice and fraud. But it should be remembered that there is no affirmative proof, in the record before us, that the sale was not held at the exact time set forth in the advertisement. The discrepancy between the time stated in the report and that stated in the advertisement is pointed out in the bill of complaint, and the court is left to hazard a guess as to the correct time at which the sale was actually made.

The presumption is in favor of the regularity of judicial sales, and, even in cases where exceptions are seasonably made before ratification, as contradistinguished from a proceeding in the nature of that now before us, mere exceptions on questions of fact, without evidence, although under oath, and although the answer to the exceptions does not deny their averments, must be overruled. Stated differently, exceptions upon questions of fact, in order to be sustained, must be supported by a preponderance of evidence sufficient to set aside the report of the trustee; which evidence should be all the more preponderating in a proceeding designed to annual a *final* ratification of a sale. *Miller's Equity Proc.,* sec. 509; *Roberts v. Loyola Perpetual Bldg. Assn.,* 74 Md. 1, 21 A. 684; *Haskie v. James,* 75 Md. 568, 23 A. 1030; *Vickers v. Tracey,* 22 Md. 196.

It is objected that the purchaser at the sale was a subsidiary of the mortgagee, and that this fact is sufficient to vitiate the sale. However, as by statute in this state (Code, art. 66, sec. 14) a mortgagee is permitted to buy in the encumbered property at a sale thereof, a pur-

chase by one bearing the relationship shown by the record in this case to the mortgagee is not subject to criticism on grounds of propriety.

Inadequacy of price is an important objection of the appellant to the sale. But it is well-settled law in this state that mere inadequacy of price, standing alone, unaccompanied by any circumstance indicating an unfair sale, is not sufficient ground for refusal to ratify a sale. The facts in each case, in this respect, are controlling. *Cohen v. Wagner,* 6 Gill. 236; *Garritee v. Popplein,* 73 Md. 322, 20 A. 1070; *Johnson v. Dorsey,* 7 Gill, 269; *Thomson v. Ritchie,* 80 Md. 247, 30 A. 708; *Noles v. Peter,* 150 Md. 700, 137 A. 916; *Waters v. Prettyman,* 165 Md. 70, 74, 166 A. 431. It may be stated that the general principle that judicial sales should be so conducted as to result in securing the best price for the property sold, is recognized by all authorities; and courts will not hesitate to set aside a sale when it is apparent that some design to limit the purchase price has been effected. Nevertheless, as stated by this court in *Evans Marble Co. v. Abrams,* 131 Md. 204, 101 A. 964, 965: "The law of this state is firmly settled, in a long line of decisions, that, in sales made by trustees under decrees in equity, mere inadequacy of price, standing by itself, is not sufficient to invalidate a sale, unless it be so gross and inordinate as to indicate want of reasonable judgment and discretion, or misconduct or fraud in the trustees, or some mistake or unfairness for which the purchaser is responsible. Every intendment will be made to support such sales, but where it is seen an injustice will be done, through the ratification of a sale, to a person not in default, by reason of the carelessness or omission of its own officer, the court will interfere to prevent it. Sales will not be set aside for causes that the parties in interest might, with a reasonable degree of diligence, have obviated. *Johnson v. Dorsey,* 7 Gill. 269; *Kauffman v. Walker,* 9 Md. 229; *Bank of Commerce v. Lanahan,* 45 Md. 397; *Loeber v. Eckes,* 55 Md. 1; *Stewart v. Devries,* 81 Md. 528, 32 A. 285; *Thomas v. Fewster,* 95 Md. 446, 52 A. 750." See *Lewis v. Beale,*

162 Md. 18, 158 A. 354, and cases cited. And in *Brown v. Gilmor's Excrs.*, 8 Md. 322, it is said: "Public policy and justice to parties interested require, that the ratification of judicial sales by courts having jurisdiction over the same should be final and conclusive, unless irregularly made by the court, or unless the purchaser was prevented by misrepresentation, surprise or fraud, from making his objection to the ratification in due time; and it must further appear, that such misrepresentation, surprise or fraud, resulted from some act or conduct upon the part of the trustees, or on the part of those interested in the proceedings." See *Forest Lake Cemetery v. Baker*, 113 Md. 529, 536, 77 A. 853; *Gottschalk Co. v. Samuelson*, 128 Md. 541, 97 A. 1003.

It has been shown that the property involved in the instant case is unimproved and unproductive; that its assessed value is $33,340; that in order to protect the property, the mortgagee advanced $4,590.08 for the payment of taxes in arrear; and that interest on the large sum of $71,000 was permitted by the mortgagor to accrue over a period of nearly two years. The mere observation of these facts conveys the impression that the property at the time of sale was of a class for which there was slight, if any, demand. Otherwise the mortgagor would have sold it, privately or publicly, and liquidated the vast indebtedness against it. This however he did not do; and the only evidence found in the record tending to show a greater value than that at which the property is assessed is his own "guess" that it is worth $75,000. High assessment values on the one hand, and low market values on the other, in connection with nearly every class of real property, are so much the order of the present period as to almost justify a court in visualizing beyond the record and taking judicial notice of this prevailing condition. We do not reach a conclusion as to the value of the property upon such a basis, but we do reach it from a careful review of the record; and that conclusion is that the same does not sustain the mortgagor's contention that the purchase price was inadequate.

In the recent case of *Busey v. Perkins,* 168 Md. 453, 456, 178 A. 254, 256, wherein a mortgage in the sum of $87,027 was executed to a trustee, covering several properties, for the purpose of securing a number of pre-existing creditors, and wherein two of said creditors, through a holding company—a subsidiary of one of the purchasers —purchased one of the properties for $10,000, this court, speaking through Judge Sloan, said: "If this had been an original mortgage loan in which it could be assumed that the mortgagee had placed the mortgage loan as the minimum value of the property, it would present a different situation, for then a bid ridiculously low as compared with the mortgage debt would cast suspicion upon the adequacy of the price. If the purchase is made by a stranger to the mortgage and the mortgagee takes his loss, no such question could arise. Two real estate brokers valued the property as a whole at $25,000, less a fair capitalization of the $80 ground rent, but one of them testified that he could give no assurance that on a resale any greater price would be realized (*Weber v. Merowitz,* 160 Md. 674, 155 A. 169), and, where the objection is based on inadequacy of price, courts are reluctant to order a resale unless there is some assurance tnat a better price would result. It appears that the property is assessed at $36,000, which, instead of furnishing some evidence of value, is one reason why it was sold at such a low price. With the mounting costs of government and public services saddled on real estate, we have the real reason why real estate values are so depressed that no one is willing to buy unless the purchase price is so low as to neutralize the tremendous burden of taxation which ownership entails. If the question of price were the only one involved in this case, we would have no difficulty in affirming the order appealed from." See *Harvey v. Provident Savings Bank,* 170 Md. 295, 184 A. 228.

Finally, it may be added, we find no evidence of fraud or fraudulent intent on the part of the mortgagee or the trustees who made the sale. What they did was in the

open, characterized by patient indulgence toward the mortgagor, and after an additional courtesy of delaying the proceedings when requested to do so by the latter. In the absence of such finding, for reasons hereinbefore stated, we must, and do, affirm the decree of the lower court.

*Decree affirmed, with costs to the appellees.*