deTAMBLE ET UX. *v.* ADKINS, ASSIGNEE

[No. 172, October Term, 1955.]

416

*Decided July 10, 1956.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, HENDERSON and HAMMOND, JJ.

*William B. Evans* for appellants.

*E. Dale Adkins, Jr.,* and *William Wilson Bratton,* with whom were *Adkins & Potts* and *Thomas S. Simpkins* on the brief, for appellee.

BRUNE, C. J., delivered the opinion of the Court.

This is an appeal from an order of the Circuit Court for Cecil County, overruling exceptions of the appellants-mortgagors to the sale of mortgaged premises made by the appellee, as assignee under two mortgages, and ratifying and confirming this sale.

The appellants attack the sale upon the following grounds: (1) insufficiency of the Notice of Sale; (2) inadequacy of price; (3) want of exercise of reasonable judgment and discretion on the part of the assignee, particularly in selling the mortgaged property as a whole and not by lots; (4) exclusion of evidence relating to subdivision of the property; and (5) exclusion of evidence of an increased offer received after the date of sale.

The principal facts in the case are summarized in the opinion of the Chancellor as follows (the order in which they are stated being somewhat different from that in which they are set forth in his opinion):

"By mortgage dated September 20, 1949, recorded September 22, 1949, Paul deTamble and wife conveyed to E. S. Adkins & Co. Inc. 180 acres of land on the east shore of the Chesapeake Bay in the First Election District of Cecil County

to secure the repayment of a loan of ten thousand dollars. Terms of payment provided therein were $1000 annually from date and the whole balance to become due in five years, interest at 6% payable annually. By a second mortgage dated October 20, 1953 the same mortgagors conveyed the same property to the same mortgagee to secure a debt of $5,965.27 payable one year from date with interest at 6%.

"Both mortgages being in default, the former about four years, the mortgagee on July 15 and July 19, 1955 assigned them to E. Dale Adkins, Jr. for foreclosure. To August 16, 1955 the total mortgage debt on both mortgages and including 1954 taxes and fire insurance premiums advanced by the mortgagee was $17,990.87.

"The advertisement of sale in the Cecil Democrat gave the names of the mortgagors and mortgagee, the dates of the mortgages and their places of record. It contained a complete description of the land and its area. At the top of the advertisement in large type it was described as 'Valuable Waterfront Real Estate'. The last four courses as shown by the metes and bounds description in the advertisement run along the Chesapeake Bay a total distance of 2813 feet. The advertisement in the Cecil Whig contained a similar reference to the mortgages, was headed in large type 'Waterfront Real Estate' and described the property as 'adjoining the development known as "West View Shores" on the east shore of the Chesapeake Bay.'

"The assignee filed his report of sale on August 16, 1955 from which it appears that after filing his approved bond and after advertising the sale in the Cecil Democrat and the Cecil Whig, two newspapers published in Cecil County, he sold the property described in the mortgage by public auction to J. E. Walls, Sr. for $28,500.00.

"On September 14, 1955 and before the expiration of the order nisi on the report of sale, the mortgagors filed exceptions to its ratification."

We shall now turn to an examination of the several grounds of attack in the light of the facts above stated and of some additional facts relating to particular phases of the case.

1. *Sufficiency of Notice.* The sale was advertised for the prescribed length of time in two newspapers published in the county where the property is situated (though publication in only one was required). Each advertisement described the property so that it could be located by the exercise of ordinary intelligence and so that more detailed information concerning it could be obtained, if desired. Each advertisement referred to the mortgages under which the sale was to be made and gave the place of recording thereof. One advertisement gave a complete description of the property by metes and bounds, courses and distances, though such a description has been held unnecessary (*Stevens v. Bond,* 44 Md. 506) ; and the other advertisement gave a general description of the property and its improvements. Each advertisement showed that the property was waterfront property on the east shore of Chesapeake Bay. We think the advertising of the sale was sufficient to meet the requirements of both the original mortgage executed in 1949 and of the second mortgage executed in 1953 and of Code (1951), Article 66, Section 5(c). See *Preske v. Carroll,* 178 Md. 543, 16 A. 2d 291; *Clemens v. Union Trust Co.,* 170 Md. 520, 185 A. 462; *Shaw v. Smith,* 107 Md. 523, 69 A. 116; *Sawyer v. Novak,* 206 Md. 80, 110 A. 2d 517.

The appellants complain of the fact that no sales bills were distributed. This is not necessary. *Preske v. Carroll, supra.* They also complain that no posters advertising the sale were placed upon the premises. This objection, too, we think is not well taken. *Chilton v. Brooks,* 69 Md. 584, 16 A. 273.

The appellants also complain that the advertisements should have been published in Wilmington and Philadelphia, on the ground that the market for property of the kind here in question is to be found in those cities. That argument, we think, is to be considered with the appellants' third contention—that the assignee did not exercise sufficient diligence to obtain the greatest possible price.

2. *Adequacy of Price.* The property was sold at a price of $28,500. The appellants produced several witnesses who valued the property on the basis of its having a waterfront

on the Chesapeake Bay at amounts much in excess of that price. One valued it at $100,000, another at $173,000, and a third at nearly $185,000. The Chancellor gave careful consideration of the testimony of these witnesses and stated that: "It is apparent that these witnesses in valuing the waterfront at $35 to $50 a front foot, were using sales prices which might be obtained for lots on the Bay, highly developed, widely advertised, abutting improved roads and having sewer, water and electricity immediately available. Such sales would often be made on installment contracts and the ultimate liquidation of a tract like this might take years."

The views of the Chancellor are supported by what this Court said in *Hunter v. Highland Land Co.*, 123 Md. 644, at 649, 91 A. 697, at 699: "The witnesses offered by the exceptants placed the value of the property at a sum much larger than the amount at which it was sold, while the witnesses produced by the mortgagee company placed the value of it at or about the amount at which it was sold. The witnesses for the exceptants valued the lands as building lots, although the improvements and developments necessary to render it available for such purposes had not been made, and to make such improvements and developments the expenditure of much money will be required, and when so made there is no certainty of a speedy and profitable disposition of the lots, especially so in view of the protracted and unprofitable efforts of the president of the mortgagor company in disposing of nearby lots where the lands had been so improved and developed. The value so placed upon the land by such witnesses is, therefore, uncertain and more or less speculative."

There was also testimony of a broker called by the appellee to the effect that he valued the property at $28,000 to $30,000. He testified that it was farm land, that it was worth $75 per acre but that because of its added value as a waterfront he doubled this valuation to $150 per acre. The mortgaged property consists of a tract of approximately 180 acres, of somewhat irregular depth, with a frontage of somewhere in the neighborhood of 2500 feet on Chesapeake Bay. The courses

and distances contained in the description of the property set out in one of the advertisements add up to a total of 2813 feet fronting on the Bay, but one of the appellants' witnesses gives the length of the saleable waterfront property at 2425 feet, and another of their witnesses based his valuation on 2500 feet of waterfront. Apart from the field containing about 75 acres, which is the frontage on Chesapeake Bay, the rest of the property is said to consist of narrow connecting corridors or strips of land. It is agreed by both sides that unless the disparity between the valuation of the property and the price obtained for it is such as to shock the conscience of the court, the sale will not be set aside for mere inadequacy of price. *Lippold v. White,* 181 Md. 562, 31 A. 2d 170. For reasons which we will discuss more fully below under the heading of "Diligence of the Assignee", we think that the Chancellor was warranted on the evidence in rejecting the appellants' valuations and in reaching the conclusion that there was no such disparity between value and price as would warrant setting the sale aside.

3. *Diligence of the Assignee.* There is no question that the assignee in making the sale under the mortgages was bound to effect the sale "under such conditions and terms as to advertisement and otherwise, as a prudent and careful man would employ, seeking to obtain the best price for his own property." *Waters v. Prettyman,* 165 Md. 70, 166 A. 431; *Carroll v. Hutton,* 88 Md. 676, 41 A. 1081; *Hopper v. Hopper,* 79 Md. 400, 29 A. 611; *Gould v. Chappell,* 42 Md. 466.

The appellants made no charge of intentional fraud or wrongdoing in connection with the sale, but they do charge want of diligence in seeking the best price.

The principal ground upon which they assert that sufficient diligence was not exercised is that the property was sold as an entirety and was not offered for sale in separate lots. They claim that the latter form of sale would have produced much better prices. They rely particularly upon *Waters v. Prettyman, supra; Long v. Worden,* 148 Md. 115, 128 A. 745; *Carroll v. Hutton, supra;* and *Gould v. Chappell, supra.*

In the *Waters Case* the mortgaged property consisted of

27 lots which formed the major part of a block in a town, and that block was surrounded by improved streets with water, sewerage and light connections in a thriving section of the community. The Court there held that the trustee did not exercise due diligence in selling the tract as a whole and set the sale aside.

In the *Long Case* the property consisted of two tracts, one on the north and the other on the south side of the National Highway in a suburban area about three miles from Cumberland. The sale there was set aside on three grounds: (1) that the property was not properly advertised; (2) that it was not properly sold; and (3) that it was sold for a grossly inadequate price. The advertisements described the properties as adjoining each other on the National Highway, about three miles west of Cumberland, and together forming about 18¾ acres of land. The inference from the advertisement was that the two tracts were to be sold as an entirety but in fact they were sold separately. The evidence also showed that the greatest utility of the property was for home and building sites and that nearby property similar in character had been divided and sold at from $35 to $40 a front foot. The Court held that under these conditions no prudent owner would have attempted to sell the property as a whole without first, at least, inquiring whether it could not be sold to better advantage in lots conforming in their dimensions to other lots in the neighborhood.

In *Carroll v. Hutton, supra,* the property sold amounted to about 1800 acres in the aggregate. It included what had been five separate farms. The assignee in making sale gave no consideration to the question whether it would, or would not, be desirable to sell the tract as five separate farms with precisely the same boundaries as the old farms had or whether some other division would be likely to produce a better price.

In *Gould v. Chappell, supra,* the situation was somewhat similar to that in the *Waters Case.* The tract was sold as an entirety in the neighborhood of a growing city and it was held that the sale should have been either by lots or on a front foot basis, but not on an acreage basis.

The appellants contend that in considering the question as to whether or not the assignee acted as a prudent man would have done in selling his own property, the alleged inadequacy of price, and the failure to subdivide the property into lots may all be considered together. The appellee contests this view, but we think that the *Long Case* and the *Waters Case* both support the appellants' contention on this point.

In *Hopper v. Hopper, supra,* there were two tracts which the exceptants to the sale claimed should have been sold as building lots. However, this claim was not sustained, and the Court stated the rule to be that "Whether it is advisable to sell land by the acre, or in building lots, depends largely upon the location of the property, and the surrounding circumstances."

In addition to the *Hopper Case* there are a number of others in which sales of property as an entirety were upheld, even though there had been some subdivision of the land and in some instances plats had been filed of record. See *Stirling v. McLane,* 103 Md. 47, 63 A. 205; *Hunter v. Highland Land Co., supra; Ten Hills Co. v. Ten Hills Corporation,* 176 Md. 444, 5 A. 2d 830; *Suburban Garden Farm Homes Corporation v. Duckett,* 179 Md. 648, 22 A. 2d 467; *Beasley v. Caplan,* 198 Md. 100, 81 A. 2d 230.

Applying the test stated in the *Hopper Case* in the light of the cases above cited, we now turn back to the actual facts of the present case.

Though the property does have a frontage on the Chesapeake Bay, it had not, at least up to the time of sale, been developed as a waterfront project, but had been used as a farm. The mortgagors, who are the appellants, owned adjoining property having a waterfront on a river flowing into the Bay. That development is known as "West View Shores." The appellants speak of it as a going development, but the testimony does not indicate that lots have been going very fast. That development was started in 1947 and was subdivided into 235 lots. It consisted originally of about 55 acres. At the time of the hearing in this case in about October, 1955, approximately one-half of the lots had been sold

and 65 houses had been built or were being built on the property, including some which were still under construction. The mortgaged property itself has a frontage of a little over 270 feet on a public road, and this road is remote from the waterfront on the Bay. The Chancellor found that the waterfront had not been laid out in lots, that no roads had been built, and that no water line, sewerage, electric power or telephone lines had been installed. The mortgagors had owned the mortgaged property for nine years and had not developed it into lots.

Their claims that the assignee should have advertised the property in Wilmington and Philadelphia, that he should have informed brokers locally or "in the urban areas to the North", that he should have subdivided the property into lots, inferentially that he should have brought in various utilities to make the waterfront lots saleable (which it is conceded would have cost at least $5,000), and that he should have obtained a much larger price for the property, all seem to be predicated basically upon the idea that the assignee, during the period of advertising the mortgage foreclosure sale, should have accomplished what the appellants themselves had not done in nine years. We think that no such accomplishment was required of him (*Hunter v. Highland Land Co., supra*), and that in the existing circumstances he acted with reasonable prudence in selling the property as a whole and in advertising it as he did. He testified that he and his counsel thought that the best way to sell the property was as a unit. (He apparently expected it to be subdivided later.) The second mortgage expressly authorized sale of the property either as an entirety or in separate parcels. Reference to the advertisement will show that attention was called to the fact that this was a waterfront property, but that fact alone does not seem to have produced any rush of bidders or offers to buy the property as if it were a well advertised and established property.

The appellants seek support in the testimony of the appellee to the effect that if he had owned the mortgaged property, he would not have sold it in the manner in which this sale was

made. We think that his testimony that he would not have sold it at the Courthouse door was merely a statement that he would not have sold it at public auction; yet that was the very kind of sale contemplated under the mortgages and under the statute.

4. *Exclusion of Evidence relating to Subdividing.* It is conceded that there was no recorded plat of the mortgaged property showing any subdivision. During the course of the hearing the appellant Paul deTamble was asked if he had in any way had the property subdivided. An objection to the question was sustained, as was an objection to a question along the same lines as to whether the witness had sold any lots out of the mortgaged property. The materiality of the first inquiry is not readily apparent. Future plans of the appellants for the subdivision and sale of the property, when there was nothing to indicate that the property was actually in course of development for building purposes or some other waterfront use, would seem to be of no moment. *Hunter v. Highland Land Co., supra.* There was no proffer on the part of the appellants to show what they sought to prove either with regard to the subdividing of the property or with regard to the possible sale of any part of it. It is difficult to believe that if the appellants had had in hand a definite, binding contract for the sale of any portion of the property, at a price which would have supported their claim as to the inadequacy of the price realized at the assignee's sale, they would not have at least made a proffer of such evidence. The fact is that the record shows no proffer at all as to either subdivision or sale, and there is, therefore, nothing before us to show that either of these rulings was prejudicial to the appellants, and their objections to the rulings accordingly cannot be sustained. *Hipple v. Mason,* 147 Md. 94, 127 A. 383; *Johnson & Higgins v. Simpson,* 163 Md. 574, 163 A. 832; *Reid v. Humphreys,* 210 Md. 178, 122 A. 2d 756.

5. *Exclusion of Evidence of an Increased Offer.* At the hearing the appellants sought to introduce into evidence a telegram from an unnamed party offering $55,000 for the

property. The policy of upholding a public sale fairly made after due advertising is well established. Little can be added to what the Court said in *Blank v. Frey,* 165 Md. 647, at 650, 170 A. 2d 156, at 157:

"Such subsequent higher bids are common after one bidder and purchaser has led the way, and they naturally give rise to dissatisfaction and doubt of the propriety of the sale, but, to repeat what this court had occasion to say in several previous cases, when a property has been fairly brought to its market, such as the market is at the time, the subsequent possibilities of obtaining a higher price do not alone furnish sufficient ground for setting aside the sale made. The court under the authority of which the sale is to be made is not holding an auction, and receiving bids accordingly, up to the time fixed for final ratification, but is to close on the sale reported unless it is objectionable on grounds existing when it was made." See also *Boyd v. Smith,* 127 Md. 359, 96 A. 526; *Loft, Inc. v. Seymer,* 148 Md. 638, 129 A. 911; *Kirkpatrick v. Lewis,* 159 Md. 68, 149 A. 614; *Gilden v. Harris,* 197 Md. 32, 78 A. 2d 167; and *Sawyer v. Novak,* 206 Md. 80, 110 A. 2d 517.

In accordance with the aforegoing views the order will be affirmed.

*Order affirmed, with costs.*