HARDY et al. *v.* GIBSON et al.

[No. 165, October Term, 1956.]

496

*Decided June 5, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Russell Hardy, Sr., pro se,* with whom was *Russell Hardy, Jr.,* on the brief, for the appellants.

*Carlyle J. Lancaster* and *T. Hammond Welsh, Jr.,* with whom were *Welsh, Dyer & Lancaster* on the brief, for Mrs. Welsh.

Submitted on brief by *William E. Hutchinson* for the Trustees.

BRUNE, C. J., delivered the opinion of the Court.

The holders of a second lien on a house and lot appeal from an order overruling their exceptions to a sale made by trustees under a deed of trust securing the first lien on the property and ratifying the sale.

The appellants, Russell Hardy, Sr., and Mrs. Katherine C. Hardy, who were formerly husband and wife but have been divorced for a number of years, were the owners as tenants in common of the premises in question. In May, 1955, they entered into a contract for the sale of this residential property, and settlement was to be made thereunder about the first of June. The purchaser under the contract was Kenneth H. Frey, and the property was to be conveyed to him and his wife. After an investigation of the title, June 3, 1955, was agreed upon as the day, and the office of the Maryland Title & Escrow Corporation at Riverdale, Prince George's County, as the place, for settlement under the contract.

The sale price was $16,950, of which $11,500 was to be paid in cash, and the balance of $5,450 was to be secured by a second mortgage on the property under the terms of which $2,500 was to be paid in six months and the balance in eighteen months. $11,000 of the cash payment was to come from the proceeds of a first mortgage on the property in that amount. The contract contained usual provisions relating to the adjustment of taxes, insurance and other items as of the date of transfer or settlement. It also provided that settlement should be made either at the office of a named real estate broker or at the office of the title company searching the title and that "deposit with the Title Company * * * of the purchase money, the deed of conveyance for execution and such other papers as are required of either party by the terms of this contract shall be considered good and sufficient tender of performance of the terms hereof." In addition, the contract contained provisions that if legal steps were necessary to perfect the title they would be taken promptly by the seller and the time for full settlement by the purchaser would be correspondingly extended, and that possession of the prop-

erty should be given to the purchaser "at or before settlement."

At the time fixed for settlement everything was in order on the part of the purchasers. Arrangements had been made for a loan of $11,000 by the Northwestern Federal Savings and Loan Association (referred to below as "Northwestern") to the Freys, to be secured by a deed of trust (serving the purpose of a mortgage) constituting a first lien on the property, and for the use of the proceeds thereof to make the cash payment to the sellers. The purchasers duly executed a note dated June 3, 1955, payable to Northwestern, "or order", for $11,000 with interest at 5%. Under it, instalments of $82 applicable to principal and interest were to be paid on the first day of each month, beginning on July 1, 1955; and the makers also agreed to pay monthly an amount equal to one-twelfth of the annual taxes, assessments and insurance premiums on the property securing the note. Northwestern had the option to advance the amount of such taxes and other charges, and the amount thereof was to be added to the borrowers' indebtedness and to be due and payable on demand, at the option of Northwestern. The purchasers also duly executed the first lien deed of trust securing this note. Likewise, they duly executed two notes, each in the amount of $2,725, payable to Russell Hardy, Sr., and Katherine C. Hardy, respectively, secured by a second deed of trust, which they also duly executed.

On the part of the sellers, a deed apparently in proper form, executed by Mrs. Katherine C. Hardy, was presented. A deed executed by Russell Hardy, Sr., alone was also presented. Following his divorce, he had remarried and the title company insisted upon having a deed in which his then wife joined, so as to obtain a release of her dower interest in the realty. It also insisted upon the dismissal of a pending partition suit between Mr. Hardy and his former wife. Neither of these requirements was met until a considerably later date. The deed was received by the title company on August 8, 1955, and the partition proceeding was dismissed on September 1, 1955.

Northwestern did not make any disbursement on account of the Frey loan on June 3rd. It did, however, some days later send to an attorney, who was the president of the title company, its check dated June 9, 1955, for $10,704.50, which he turned over to the title company. It was deposited in that company's escrow bank account on June 13, 1955, and is entered on the company's escrow and settlement ledger under that date. Just how the amount of $10,704.50 was arrived at is not clear, but nearly all of the difference of $295.50 between the amount of the mortgage loan and the amount of the check seems to be accounted for by two insurance charges aggregating $92.50 and by estimated "advance taxes" of $200 for ten months, which appear on the Freys' settlement sheet. The funds placed in the hands of the title company remained there until the title difficulties were cleared up. On September 8, 1955, the title company remitted to the Hardys the net cash proceeds of sale to which they were respectively entitled by checks aggregating $10,504.43. (There is a slight discrepancy between this amount and that shown on a settlement sheet dated June 3, 1955, signed by the Hardys, but it is in accord with the title company's escrow and settlement ledger.)

The first deed of trust named Richmond H. Gibson and William K. Copenhaver as Trustees. Both of them were and are directors of Northwestern and Gibson was also its president. The deed provided in part that: "Upon default in the performance of any of the terms and conditions of said note which the borrower does hereby agree to perform * * *, the said trustees shall at the request of the Association [Northwestern] sell *· * * said land and premises * * * at public auction * * *."

The property was sold on June 27, 1956, pursuant to an advertisement in a Prince George's County newspaper published for the first time on May 31, 1956. On June 22, 1956, the Trustees docketed this suit in the Circuit Court for Prince George's County and filed their bond before the sale. It appears that only two persons made bids at the sale. The highest bid was $12,300. It was submitted by Mrs. Mildred

B. Welsh, who was acting on behalf of the law firm of Welsh, Dyer & Lancaster. Among those present at the sale were two members of that firm, the Trustees, their counsel, who was also counsel for Northwestern, and Mr. Russell Hardy, Jr., who seems to have attended as counsel for his mother. The Trustees reported to the Circuit Court the sale to Mrs. Welsh at the price above stated and asked that the sale be ratified. The appellants filed exceptions to the ratification of the sale. Later they filed a motion to dismiss the suit, and they also claimed that the absence of a resident agent of Northwestern on whom they could serve a *subpoena duces tecum* deprived them of a fair and constitutional trial.

The appellants' contentions may be thus summarized: (1) that there was no default under the Frey loan from Northwestern; (2) that there was no request from Northwestern to the Trustees to sell the property; (3) that the advertisement of sale was so inaccurate as to be legally insufficient; (4) that the purchasers, being counsel for the mortgagors, acquired and hold title for the latter; (5) that the suit was barred under Section 87 of Article 23 of the Code (1951) because Northwestern had not met and continued to meet the requirements of Section 86 of that Article as to qualification to transact business in Maryland; and (6) that they were barred from getting compulsory process against Northwestern.

The last of these contentions may be disposed of first. Essentially, the appellants' position seems to be that if they could not obtain documentary evidence from Northwestern by serving a *subpoena duces tecum* on a resident agent of Northwestern at his address as shown on the records of the State Tax Commission, they were denied a fair trial. There is no showing that they made any effort to locate the resident agent, who was one of the Trustees, at any other address (though there is a statement by his counsel that he had moved to a new address in the same neighborhood as the old one), there is no showing that any demand for such documents was made upon his counsel, and the record shows that the Secretary of Northwestern, who was the custodian of its

records was present in court on the first day of the trial and had with him Northwestern's file relating to the Frey loan. No demand for its production and inspection was made either in open court or by causing a *subpoena duces tecum* to be served on him. The offer of counsel to produce papers from the file was rejected by the appellants because it did not involve the production of evidence under compulsory process, but a "handful of papers" was submitted to the appellants for examination. The trial judge stated his willingness to grant a continuance if it was necessary for the appellants to obtain evidence required for the presentation of their case. The matter of granting a continuance is usually in the sound discretion of the trial court. *Millstein v. Yost,* 197 Md. 348, 79 A. 2d 149. See also *Plank v. Summers,* 205 Md. 598, 109 A. 2d 914, and cases therein cited. We think that the trial judge afforded the appellants full opportunity to obtain any needed documentary evidence and acted not only within the limits of the discretion confided to him, but with careful regard for the protection of the interests of the appellants.

We may also note that the appellants made no attempt to use the discovery procedure available under our then (as well as present) rules and none to serve a summons under the procedure provided under Sections 92-95 of Article 23 of the Code, when service cannot be effected upon a designated resident agent.

We find no merit whatever in the appellants' contention that they were denied a "fair and constitutional" trial.

The appellants' contention that the maintenance of this suit is barred under Section 87 of Article 23 of the Code (1951) will be considered next. (References to Section numbers will, unless otherwise stated, be to Sections of that Code Article.)

The appellees seek to refute this contention by the provisions of Section 153 (e). Under it, if a Maryland building and loan association is converted into a Federal savings and loan association by following the procedure prescribed by other subsections of Section 153 and by complying with the appropriate Federal statutes, the resulting corporation is to

be considered a domestic corporation, notwithstanding that it is organized under the laws of the United States and would otherwise fall under the definition of a foreign corporation contained in Section 83. That Northwestern resulted from such a transformation seems to be implicit in a statement by counsel for the Trustees made in argument on the Hardys' motion to dismiss; and the Hardys' brief in this Court almost concedes this to be true, since the Hardys do not deny the ultimate fact of conversion from a Maryland to a Federal association but takes the position that there is no proof that the requisite procedural steps to accomplish the conversion have been followed. However, we have been unable to find any evidence in the record of the original Maryland organization of Northwestern and its subsequent transformation into a Federal savings and loan association; and both the factual and legal situations on this phase of the case are complicated by the fact that Northwestern appears to have qualified under Section 86 to transact business in Maryland. That Section is in terms applicable to foreign corporations. On this state of the record we do not find adequate support for the contention of the appellees based upon Section 153 (e).

Northwestern failed to maintain its qualification properly under Section 86 in that it did not certify to the State Tax Commission a change in its post office address in the City of Washington or a change in the address of its resident agent in Maryland.

The short answer to the appellants' contention based upon the alleged lack of qualification of Northwestern is that this suit is brought by the two individuals who were named as trustees under the first deed of trust. The appellants assert that the Trustees are merely nominal parties and that the suit is really by Northwestern or by persons claiming under it and hence is barred under Section 87 (c).

We think it clear that under Code (1951), Article 66, Section 5, the Trustees are not simply nominal parties. This Section is applicable to deeds of trust in the nature of mortgages as well as to mortgages. *LeBrun v. Prosise*, 197 Md. 466, 79 A. 2d 543; *Lewis v. Beale*, 162 Md. 18, 158 A. 354. Cf. *Silver Spring Title Co., Inc. v. Chadwick*, 213 Md. 178,

131 A. 2d 489. Under provisions of earlier laws now incorporated in Section 5 of Article 66, the confidence reposed in a named person authorized to make a sale under a power contained in a mortgage is well recognized (*Barrick v. Horner*, 78 Md. 253, 27 A. 1111), and a corporation is not authorized to exercise a power of sale. *Frostburg Bldg. Ass'n v. Lowdermilk*, 50 Md. 175; *Queen City Bldg. Ass'n v. Price*, 53 Md. 397. Under Section 5 (b) of Article 66, any person authorized to make a sale of mortgaged property under a power contained in the mortgage is required to file a bond before making the sale, and the jurisdiction of the court attaches upon the docketing of an appropriate suit and the filing of the mortgage or a copy thereof, with or without the bond. Though Northwestern might have been fully qualified to transact business in Maryland, it could not itself have instituted proceedings under Section 5 of Article 66; the Trustees named in the deed of trust could and did do so. The holder of the note was not a necessary party. See *Hays v. Dorsey*, 5 Md. 99, which arose under a similar local law applicable to Baltimore City.

The appellants' contention that there was no default under the Freys' loan was rejected by the trial judge. We think that the evidence fully sustains his finding. The appellants seek to establish their contention by asserting that no instalments of principal or interest or for the payment of taxes and insurance became payable prior to October 1, 1955, and that the $200 "advance taxes" item should be applied against instalments accruing on and after October 1, 1955. We see no reason for postponing the accrual of instalments until October 1. Northwestern's money was available for disbursement at any time after June 9, 1955, when the appellants should comply with the requirements of the title company as to a deed binding the dower interest of the second Mrs. Hardy and disposition should be made of a partition proceeding between Mr. Hardy and the first Mrs. Hardy. Nothing is shown which would indicate that either requirement was arbitrary or unreasonable. The Freys had been given possession of the property on June 3rd by the real estate agent who had negotiated the sale for the Hardys. Northwestern

might have withdrawn the funds from the title company pending the clearing up of the title; but unless the entire transaction was to have been rescinded, this would have been a useless gesture, since Northwestern would have had to hold the funds for disbursement when the title problems were cleared up and, as a practical matter, could not have used the money for any other mortgage loan while holding it available at any moment for this one. The delay in consummation of the transaction was due to the appellants, not to Northwestern.

Northwestern started to make interest charges against the Freys on June 9, 1955. This was the date of its check to the president of the title company, which was deposited on June 13 in the title company's escrow account. The deed of trust dated June 3, 1955, called for interest at 5% and for payment of the first instalment on account of principal and interest on July 1, 1955. We see no reason for penalizing Northwestern for the appellants' delay.

Nor do we see any basis for overriding the establishment of the "advance taxes" item of $200 on June 9 and the application of slightly more than that amount ($204.34) to the payment of taxes early in August, 1955. The parties directly concerned agreed to it, it was within the provisions of the deed of trust, and the agreement was carried out.

Items other than payments on account of principal and interest provided for under the deed of trust apparently amounted to $22.00 a month and the total amount of each monthly instalment was $104.00 (being the sum of $82.00 and $22.00). From July 1, 1955 to and including May 1, 1956, eleven instalments aggregating $1144 fell due. Total instalment payments made by the borrowers sporadically (and none of them after March 14, 1956) during that period amounted to $706.50, according to Northwestern's ledger sheet on the Frey loan. These figures amply warrant the trial court's finding that the loan was in default. We may add that the borrowers and the lender agree that the loan was in default when proceedings for the sale of the property were begun. Assuming that the appellants are entitled to raise this question, the facts do not, in our judgment, support them.

We find the appellants' contention that there was no request by Northwestern that the Trustees sell the property equally untenable. Without reviewing the evidence in detail, it is evident that the board of directors of Northwestern authorized foreclosure as early as October, 1955, that efforts to get the loan up to date continued until about the following May, but that the borrowers, in spite of pressure and occasional payments, were constantly falling behind. Mr. Copenhaver, one of the Trustees and a director of Northwestern, testified that he was requested by Northwestern to sell the property. Mr. Gibson, the other Trustee, did not testify, but it was stipulated that his testimony would be the same as Mr. Copenhaver's. The Secretary of Northwestern also testified to that effect. Also assuming the right of the appellants to raise this contention, we think that the evidence supports the finding of the trial court thereon, which is adverse to the appellants.

The appellants' contention that the purchasers at the sale hold title as trustees for the mortgagors is founded upon an alleged breach of duty by the purchasers, who were counsel for the Freys in this and other matters, towards the Freys. The basis upon which the appellants seek to assert a claim based upon this theory is not apparent. If the Freys wished to complain, a very different situation might be presented; but the testimony of Mr. Frey is explicit that he, at least, approved of their counsel's buying in the property for their own account. Mrs. Frey did not testify. The attack on this phase of the case which the appellants make in this Court was not raised in the trial court. Counsel under attack have naturally preferred to defend their action rather than to stand on the ground that the question was not raised below. However, we think that the question is not reviewable here under either our former Rule 9 relating to Appeals, which was in force when the case was tried, or under Rule 885 of the present Maryland Rules, which permits decision by this Court of a point or question not decided by the trial court "where a point or question of law was presented to the lower court and a decision of such point or question of law by this Court is necessary or desirable for the guidance of

the lower court or to avoid the expense and delay of another appeal to this Court * * *." In this case, since the question was not presented in the trial court, it is not properly before us and we do not undertake to decide the point or the appellants' standing to raise it.

The appellants' other contention relates to the sufficiency of the advertisement of sale. Their principal criticism is directed against the description of the house as a one and one-half story house, instead of a two-story house with an attic. Also, there is no mention in the advertisement of a garage building or of any wiring for air conditioning, and the rooms are said not to have been described in sufficient detail. An earlier advertisement which the appellants seem to have approved described the property as being a two-story house. It seems that because of a slanting roof, the second floor is smaller in size than the first. The garage was said to be in a poor state of repair. The advertisement did correctly describe the location of the lot and referred fully to the recorded plat on which it was shown.

The appellants—or at least Mr. Hardy, Sr.,—and also Mr. Hardy, Jr., who seems to have acted as counsel for his mother, had a copy of the advertisement before them fully two weeks before the sale. Mr. Hardy, Jr., attended the sale. At no time either at or before the sale did he or his father make any protest to the Trustees or their counsel as to the accuracy or sufficiency of the advertisement. No evidence was adduced to show that at the time of sale the value of the property exceeded the highest bid. No bid was made by or on behalf of the Hardys. The only bids were made by a representative of Northwestern (its Secretary), who made a bid of $12,000 on its behalf and by Mr. Welsh, whose bid of $12,300 was the highest and was taken over by Mildred B. Welsh. The sale was not well attended, but those who did attend had a full opportunity to inspect the entire premises before the bidding began.

We think that the advertisement was by no means perfect. What was said by Judge Henderson, speaking for the Court in *Sawyer v. Novak,* 206 Md. 80, at 87-88, 110 A. 2d 517, at 520-521, is appropriate here: "Certainly the advertise-

ment was not as full and clear as it might have been. But the cases seem to hold that a failure to fully describe the nature and extent of improvements will not vitiate a sale, unless it is shown that the omission was prejudicial to the sale of the property at a fair and adequate sum, and that a resale would be likely to produce a greater amount. *Cockey v. Hampson,* 140 Md. 551. See also *Holton Park Co. v. Gary,* 133 Md. 509, 517; *Long v. Worden,* 148 Md. 115, 122; *Welch v. Byerly,* 150 Md. 107, 112; *Bregel v. Beckman,* 157 Md. 471; *Kres v. Hornstein,* 161 Md. 1, 4; *Ten Hills Co. v. Ten Hills Corp.,* 176 Md. 444, 449. In one of the latest cases, *Preske v. Carroll,* 178 Md. 543, 547, where there was a sale of a hall 'suitable to be used as a skating rink or dance hall, and other buildings', which failed to specify certain cabins and a shower bath house as the 'other buildings', it was said: 'Failure of a notice of sale to mention or properly describe improvements on mortgaged premises may be sufficient ground for vacating the sale, if shown to be prejudicial to it, but such a result will not follow where no evidence has been produced to show that the omission misled anyone or had any prejudicial effect.' There is a presumption in favor of the validity of judicial sales and the burden of establishing the contrary is upon the exceptant. *Ten Hills Co. v. Ten Hills Corp., supra; Webster v. Archer,* 176 Md. 245, 253." See also *deTamble v. Adkins,* 210 Md. 414, 124 A. 2d 276.

We also note here, as in *Sawyer v. Novak, supra,* that the appellants have not filed a bond to stay the operation of the order of the Circuit Court, and a deed has been executed and recorded. In view of the conclusions above stated it is not necessary to go into the question of what effect these facts would have in the event of a reversal.

*Decree affirmed, with costs.*