BROOKS ET UX. *v.* BAST, ETC. ET AL.

(Two Appeals in One Record)

[No. 281, September Term, 1965.]

*Decided April 27, 1966.*

The cause was argued before PRESCOTT, C. J., and HAMMOND, MARBURY, BARNES and McWILLIAMS, JJ.

*A. Frederick Taylor,* with whom were *Martin & Taylor* on the brief, for the appellants.

*Nolan C. Chipman,* with whom were *Sidney I. Fradkin, Wm. I. Norris, Jr.,* and *George C. Bast, Jr.,* on the brief, for the assignee, one of the appellees.

*J. Melville Townsend,* with whom were *J. Wilmer Cronin, J. Elmer Weisheit, Jr.,* and *F. Vernon Boozer* on the brief, for the intervenor-purchaser, the other appellee.

HAMMOND, J., delivered the opinion of the Court.

The appellants, husband and wife, seek to overturn the ratification of a foreclosure sale of their motel property and residence and to reverse a decree requiring them to pay rent for occupancy and use of the properties after the sale. Their claims are that the chancellor erred (1) in hearing and deciding the case at a time when the husband was ill and could not testify; (2) in dismissing the exceptions to the ratification of the sale

(because (a) they had been lulled falsely by the mortgagee into the belief that the foreclosure, although commenced, would not be concluded and therefore did not press efforts to refinance, (b) the advertising of the sale was fatally inadequate and defective, (c) the sales price was so low that the conscience of the chancellor should have been shocked to the point of ordering a resale) ; and, finally, (3) that the amount of rent set by the chancellor was excessive.

None of the contentions raised is sound or has substance or merit. The foreclosure sale was held on July 7, 1964, and the report of sale was filed two days later. It was not until April 6, 1965—because of various pleadings (including intervention by the purchaser and its subsequent effort to rescind the sale for delay and uncompensated lack of possession), the utilization of deposition and interrogation procedures and various illnesses of counsel and a judge—that the case came on for hearing. Judge Raine then was told that one of the exceptants, the husband—Archer W. Brooks, had suffered a stroke and could not testify. Judge Raine felt that in view of the long lapse of time since the sale, the legitimate interests of the purchaser in having a determination of its status and rights and the uncertainty as to when Brooks could appear, the hearing should go on. Thereupon, unwillingly, Brooks' lawyer asked to be sworn, and was, and took the stand to testify as to what Brooks would say under oath if he, rather than his lawyer, was on the stand. The appellees, the assignee for foreclosure and the intervening purchaser, stipulated that Brooks would, if present testify to the facts that his lawyer said he would.

Maryland Rule 527 c 1 and 2 requires that a motion for continuance on the ground that the evidence of an absent witness otherwise would be wanting is to be supported by an affidavit alleging that "the action cannot be tried with justice to the party without such evidence," that the affiant has a reasonable expectation and belief that the witness can be procured within a reasonable time and setting out the facts (believed by the affiant to be true) that the witness will prove "and not merely the effect of such facts in evidence." Rule 527 c 4 provides further that if the court is satisfied of the truth of the affidavit and that the testimony is material and competent,

"the court may continue or postpone the case for such time as may be deemed necessary to enable the party to procure the attendance or obtain the testimony of such absent witness, unless the opposite party will admit that the absent witness would, if present, testify to the facts alleged in the affidavit."

The general rule of law is that the granting or denying of a continuance is in the sound discretion of the court and unless the judge acts arbitrarily or prejudicially in exercising that discretion, his action will not be interfered with on appeal. *Thanos v. Mitchell,* 220 Md. 389. If it be assumed, in light of the rule, that the sworn testimony of Brooks' lawyer was equivalent to the affidavit required by the rule and that the other specified prerequisites were met, we find no abuse of discretion in refusing a continuance inasmuch as Brooks' opponents at the hearing stipulated that he would have testified, if he had been present, as his lawyer said he would.

In deciding whether the sale should be ratified, Judge Raine fairly and reasonably could have concluded from the testimony before him, including that proffered on behalf of Brooks, that the true picture was as follows.

Brooks began borrowing from Bradford Federal Savings and Loan Association in 1953 in order to enlarge his restaurant and motel in Baltimore County at White Marsh on the Pulaski Highway (Route 40), the then principal and very heavily traveled north-south automobile route. The enterprise prospered, and additions and improvements were made from time to time by use of money borrowed from Bradford. The mortgages securing the borrowed money were kept current or prepaid. In 1961 the Brookses owed Bradford a balance of some $115,000 and, desiring to build a residence on the shore of Bird River, some six hundred feet away from the restaurant-motel complex, arranged to borrow from Bradford $165,000 to be secured by a new mortgage, payable monthly for seven years, in order to pay off the existing loan and have available the new $50,000 to build their house.

In November 1963 the new Northeast Expressway (now the John F. Kennedy Highway), a non-access toll road which runs parallel to Route 40 from outside Baltimore almost to the Dela-

ware Memorial Bridge, was opened and immediately diverted a very great number of cars from Route 40, with disastrous financial results to the Brooks' restaurant-motel. In late November Brooks told Bradford he could not make a payment "due to the new highway taking all the business away." Falling income continued and by the Spring of 1964 the Brookses were about $40,000 behind in their mortgage payments. Between November 1963 and May 1964 Brooks and the officers of Bradford had a number of meetings. Once Brooks said he hoped Bradford would not foreclose because the property would not bring the amount of the mortgage. Another time he said he was ready, if he could, to walk away and leave the restaurant-motel. Brooks unsuccessfully made energetic and persistent efforts to secure help from the federal Small Business Administration. The evidence as a whole permitted, if it did not almost require, a finding that Bradford did not tell Brooks, as he claims, to disregard a letter stating that the mortgage would be foreclosed or, after he saw the main advertisement of sale, tell him to disregard it because the sale would be "rescinded." Judge Raine was justified in finding, as he did, that Brooks knew for a long time that the mortgage was going to be foreclosed and that the claims he makes that had he had longer and firmer warning he could have refinanced "is a matter of conjecture and speculation" only, and there was no evidence that Brooks was injured by Bradford's words or conduct, except to the extent that foreclosure legitimately resorted to ultimately hurt him.

The advertisement of sale in The Jeffersonian described the property as a valuable fee simple "Modern Restaurant and Motor Court Property known as Brooks Williamsburg Inn, containing 8.89 Acres of Land, More or Less * * * fronting approximately 700 feet on the South Side of Pulaski Highway, White Marsh, 11th Election District of Baltimore County, Maryland." It also gave the details of the mortgage (including the place of record), described the mortgaged property by metes and bounds, detailed the improvements giving the number of motel rooms and a description of them, and told of the "modern brick, stone and frame dwelling containing seven rooms, 2½ baths, with 2-car garage, approximately 600 ft. in rear of res-

taurant." Similar advertisements appeared in the Baltimore Sunday Sun and the Wall Street Journal. Brooks refused to allow the assignee for foreclosure to post the property, threatening the use of force if he did not remove the sign advertising the sale which he proposed to put up.

The day of the sale was clear. There were, according to the testimony of the assignee and the auctioneer, between thirty and seventy-five people in attendance. Many of them, with Brooks' assistance, inspected the restaurant and motel and some looked over the residence. The bidding started at the appointed hour at $100,000 and there was multiple bidding up to $135,000. Thereafter, only two bidders remained in competition and the property was finally knocked down at $147,000.

Two real estate experts offered estimates of value for the exceptants. One thought the properties were worth $450,000, the other $400,000. Both used land values (unsupported by objective data) and reconstruction cost less customary depreciation on the type of building material involved. An expert for the assignee and purchaser analyzed comparable sales of both undeveloped land and motel properties nearby, figured reproduction cost (at a higher unit cost than the experts for the exceptants) and then used a sixty per cent depreciation rate based on "incurable and curable" functional obsolescence and economic obsolescence. The functional obsolescence included the smallness and design of the motel rooms compared to those of modern motels, some lack of bathroom facilities and the cheapness in design and appearance of available bathrooms, and the relatively poorly planned arrangement of the motel structures and rooms compared to modern motels (which the witness thought left but fifteen years at most of ailing life for the motel), and the economic obsolescence resulted from "the change of road traffic from Pulaski Highway to Northeast Expressway [which] has seriously hurt all buildings of this type and businesses of this type along Pulaski Highway." This expert, with the help of a certified public accountant, analyzed the receipts and expenses of the Brooks enterprise for the years of 1961, 1962, 1963 and part of 1964 and found a declining trend which went sharply lower in 1963 (resulting in a loss) and the first part of 1964. Using a capitalization figure of 12 per cent of in-

come, he found a value of $193,666. Giving consideration to comparable sales, reproduction cost less functional and economic depreciation, and capitalization of income, all of which gave almost the same result, he put a value of $195,000 on the properties. In his opinion the residence, which cost over $50,000 in 1961, was, because of its location and environment, a "big over-improvement" and the maximum it would bring was $40,-000. Judge Raine also had before him Brooks' proffered testimony that in August 1965 Brooks agreed to sell the properties, with furnishings, good will and liquor licenses (which were not covered by the foreclosed mortgage) for $205,000.

The two generally controlling rules as to the adequacy of an advertisement of a judicial sale are (1) that the advertisement is sufficient if it describes the property so that it can be located by the exercise of ordinary intelligence and so that more detailed information concerning it could be obtained, if desired, *deTamble v. Adkins,* 210 Md. 414, 420, and cases cited, and *Ruby v. Bowlus,* 217 Md. 115, 120; and (2) that failure to mention or fully describe the nature and extent of improvements (a failure here claimed) will not vitiate a sale unless the exceptant meets his burden of overcoming the presumption of the validity of a judicial sale by showing that the omission was prejudicial to the sale of the property at a fair and adequate sum, and that a resale would be likely to produce a greater amount. *Hardy v. Gibson,* 213 Md. 493, 507-08, and cases cited; *Sawyer v. Novak,* 206 Md. 80; *Preske v. Carroll,* 178 Md. 543, 547. The advertisements in the case before us clearly identified the property and afforded access to more detailed information by one sufficiently interested to desire it. The exceptants failed completely to show that any omission in the descriptions of the improvements or attractions of the property were prejudicial to a fair and adequate price or that a resale would be likely to produce a greater amount. The contentions of the exceptants on the point are not furthered or strengthened by the fact that they read the main advertisement several weeks before the sale and did not complain of it then or at any other time before the sale, or during the sale when it was read by the auctioneer.

On the question of the adequacy of the sales price, the chan-

cellor was justified in accepting, as he did, the estimate of the expert for the assignees and purchaser as much more realistically tied to existing actualities and closer to the fair market value of the property than the estimates of the experts for the exceptants, which were theoretical because based on the reproduction cost of something no one would be likely to want to reproduce. He was likewise justified in determining that the best use for the property was as a motel and that Brooks used it for that purpose well, but that "he wound up with a white elephant on his hands [and] it doesn't make any difference what it cost to produce the white elephant, if nobody wants to buy one, you've got something of no value on your hands." The chancellor found, properly we think, that the sale was fairly conducted and made and that the disparity, if any, between value and sales price produced no shock to his judicial conscience. He was right, then, under the test of the cases in ratifying the sale. *deTamble v. Adkins, supra; Lippold v. White,* 181 Md. 562; *Preske v. Carroll, supra.* Even in cases where the discrepancy between the sales price and the estimates of the exceptants was reasonably comparable in the case before us, this Court has held the sales price was not so inadequate as to require rejection of the sale. See *Preske, Sawyer* and *deTamble.*

There remains the matter of the chancellor's order requiring the exceptants to pay rent from July 17, 1964. They concede the right of a purchaser at a mortgage sale to a fair rental between the time of purchase and the taking of possession, as under *Union Trust Co. v. Biggs,* 153 Md. 50, 56, they must, but challenge the amount of $1,370 a month rent set by Judge Raine. A well-qualified expert who had studied the matter and, in reaching his estimate, used the lowest occupancy rate being experienced by any motel along the Pulaski Highway (forty per cent) testified that $1,370 a month was fair rental. The expert of the assignee and purchaser, as part of his data in setting a fair market value, had thought that approximately $1,850 a month would be a proper rent. Brooks, immediately after the sale, had offered $2,000 a month and, shortly thereafter, $1,800 a month. The exceptants offered no evidence that $1,370 a month was unfair. We find no error.

*Orders affirmed, with costs.*