JACKSON *v*. TOWNSHEND, ETC.

[No. 37, September Term, 1967.]

*Decided February 15, 1968.*

*Motion for rehearing filed February 19, 1968; denied March 4, 1968.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, BARNES, McWILLIAMS and SINGLEY, JJ.

*Raymond Godbersen* for appellant.

*William E. Kirk* for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

Appellant (Jackson) asks us to upset the mortgage foreclosure sale of his property. Appellee (Townshend), the attorney who made the sale, insists we should affirm the chancellor, before whom he prevailed. The purchaser was not made, nor did he become, a party to these proceedings.

In October 1962 Richard Salter and his wife became the owners of Parcel No. 1 (see plat). On 26 July 1963 they acquired Parcel No. 2 and on the same day, to secure a loan of $6,000 (the purchase price of Parcel No. 2), they mortgaged both parcels to Loyola Federal Savings and Loan Association (Loyola). In January 1964 they conveyed both parcels to Jackson, subject to the mortgage, which he assumed. The record indicates that Parcel No. 1 represented an investment of $7,000.

Jackson, instead of making the monthly payments as they became due, fell into the habit of allowing two or three payments to become overdue and then paying them all at once. There is no evidence that Loyola made any objection to this practice.

On 21 June 1966, the March, April, May and June payments being overdue, Loyola sent to Jackson, by certified mail, a letter advising him that the mortgage had been turned over to Townshend for foreclosure. The letter further stated that the first advertisement of sale would appear in the "Anne Arundel County papers" on Thursday, 23 June. Why this letter was returned to Loyola by the postal authorities, marked "Unclaimed," we do not know. On 22 June, Loyola rendered a statement to Jackson showing a principal balance of $5,033.54 and payments totaling $236.00 (plus $110.08 for the expense account) to be due. The "date payment [was] due" according to the statement was 1 July 1966. The statement also showed an unexpended balance of $265.77 in the expense account.

Although the foreclosure case was not docketed until 28 June, the first insertion of the advertisement of sale was published in the 23 June issue of the Maryland Gazette. 19 July was designated as the day of sale. On 14 July Jackson sent 2 checks, one dated 12 July and one dated 15 July, each for $174.72, to Loyola in settlement of the payments then due plus the late charges. On 18 July both checks were returned to Jackson, by certified mail. The covering letter appears to confirm a statement made to him in a telephone conversation on that day to the effect that the checks could not be accepted because "the mortgage * * * [had] been placed in the paper for foreclosure." The record seems to indicate this was his first knowledge of the impending foreclosure. At 9:00 a.m., on 19 July, the day of the sale, Jackson's attorney telephoned Townshend and offered to bring the payments to date and pay all costs. Townshend told him "it was too late * * * the Board of Directors would not accept a part payment." Both parcels were sold to Ronald Hollander who, at $12,100, was the highest bidder therefor. Two days later, 21 July, Jackson tendered the entire mortgage debt and all costs and expenses, which, of course, was refused.

Jackson contends, among other things, that the advertisement of sale was inadequate. He contends also that if the two parcels had been offered separately it would have been unnecessary to sell both of them. In dealing with these contentions we shall relate whatever additional facts and circumstances may be necessary.

I.

The advertisement informed the public that Townshend would sell "on the premises"

> "All those two parcels of ground situate, lying and being in the First Election District of Anne Arundel County, State of Maryland,
> "PARCEL NO. 1: KNOWN AND DESIGNATED as Lots Nos. 211, 212, 213, 214 and 215, * * * as shown on the Map of Woodland Beach, Sheet No. 1 * * *."
> * * *
> "PARCEL NO. 2: KNOWN AND DESIG-

NATED as Lots Nos. 216, 217, 218, 223, 224, 225, 226, 227, 228, 229 and 230, * * * as shown on the Map of Woodland Beach, Sheet No. 1 * * *."

* * *

"The above described property is improved by a two story, frame dwelling with modern conveniences.

"TERMS OF SALE: A cash deposit of $750.00 will be required of the purchaser * * *.

"For further particulars, apply to:

William W. Townshend, Jr., Attorney
Towns-Worth Building, South Street
Annapolis, Maryland"

In assessing the adequacy of the advertisement it must be remembered that Townshend was the attorney named in the mortgage and that he represented Loyola in the settlement of the mortgage transaction. It is reasonable to assume that he examined the title to both parcels or that he had before him, at the time, abstracts made by a title examiner. He must, therefore, have been aware that Parcel No. 1 fronted on Mayo Road, a main thoroughfare (State Route 214), and that Blue Ridge Road and Bay Bridge Road (40 foot streets) formed two of the boundaries of Parcel No. 2.

Townshend testified that he did not inspect the premises before preparing the advertisement and that, at the time, he did not know that Parcel No. 1 was commercially zoned. He said he knew there was "some type of building there," but he thought it was "just sort of a converted private garage." He did not mention it in the advertisement because he "didn't feel that it had that much value * * * that both pieces had to be sold together as one unit." How he was able to reach that conclusion without inspecting the property was not made clear. In fact, the building was occupied by an auto body and paint shop and producing $75 per month in rent. He admitted that he learned Parcel No. 1 was commercially zoned about two weeks before the sale. He made no effort, however, to readvertise or to correct or revise the advertisement or the handbills. Townshend represented in the advertisement that he was in a position to provide further particulars but his testimony suggests that his

12

knowledge of the property was deficient in at least several significant respects. It is unlikely, therefore, he would have been able to provide an interested person with full information about the property even if he had been asked.

In our judgment the advertisement suggests nothing more than an impending sale of a string of 20 foot lots in Woodland Beach "improved by a two story, frame dwelling with modern conveniences." We see nothing to indicate that there was being offered for sale a compact piece of land containing nearly ½ acre fronting on a main thoroughfare and two side streets, a substantial portion of which is zoned commercial and which was producing a total of $135 per month in rent. Nor is there anything to hint the presence of a large food market (Meleddy's Super Market) on the opposite corner or that there are other commercial operations in the immediate neighborhood. It seems unlikely that buyers of property susceptible to commercial exploitation, once having read the advertisement, would have given the matter any further consideration, unless, of course, they were otherwise familiar with Jackson's property.

*Long v. Warden,* 148 Md. 115, 119-20, 128 Atl. 745 (1925), presented to the Court a situation somewhat like the situation here, except that there the sale price was grossly inadequate. The comment of Judge Offutt, who delivered the Court's opinion, is interesting:

> "In the advertisement of sale the assignee announced that he would
> " 'on Friday, August 8th, 1924, at 10:30 A. M., on Baltimore Street in front of the Second National Bank, in Cumberland, Allegany County, State of Maryland, sell to the highest bidder all those two tracts of land lying in Allegany County, Maryland, adjoining each other, on the National Highway, about three miles west of the City of Cumberland, both of said two tracts forming together 18¾ acres more or less.'
> "It is apparent from these facts, (1) that the property was not properly advertised, (2) that it was not properly sold, and (3) that it sold for a grossly inadequate price.

"No one could possibly learn from the advertisement that any part of the property was to be sold in lots, and indeed the most natural inference to be drawn from the language of the advertisement was that both parcels were to be sold together, because, while it referred to the fact that there were two tracts, it stated that they 'adjoined each other,' and gave the total acreage of both tracts, but did not give the separate acreage of either. *So that persons desiring to buy a single lot would not have been induced to attend the sale, because there was nothing in the advertisement to indicate that the property would be sold in divisions smaller than the entire acreage;* certainly there was nothing in it to indicate that any part of it was to be sold in fifty foot lots.

"When it was sold, however, it was not sold by the entirety, nor by tracts nor by lots. The 7.9 acre tract was sold as one piece, and three fifty foot lots were sold from the 10.85 acre tract, *so that while the advertisement failed to notify prospective buyers desiring to bid on single lots that single lots would be offered,* the manner of sale prevented persons who may have desired to bid on the whole 18¾ acres from bidding. Certainly it would be difficult to contrive any method of selling property less likely to bring its fair market value than that followed in this case." (Emphases supplied.)

Although advertisements as terse and scanty as the one now being considered ought not to be encouraged we are nevertheless unable to say, in the circumstances here present, that it is so lacking in sufficiency as to require setting the sale aside.

In *Butler v. Daum,* 245 Md. 447, 451, 226 A. 2d 261 (1967), the "rules generally controlling the adequacy of an advertisement of a judicial sale" were restated. Judge Horney, for the Court, said:

"[T]he advertisement is sufficient if it describes the property so that it can be located by the exercise of ordinary intelligence and so that more detailed infor-

mation concerning it can be obtained if desired, *Brooks v. Bast*, 242 Md. 350, 219 A. 2d 84 (1966), *Ruby v. Bowlus*, 217 Md. 115, 140 A. 2d 513 (1958), *cert. den.* 358 U.S. 856 (1958), *deTamble v. Adkins*, 210 Md. 414, 124 A. 2d 276 (1956), *Preske v. Carroll*, 178 Md. 543, 16 A. 2d 291 (1940) ; and (2) the failure to mention or fully describe the nature and extent of the improvements will not vitiate a sale unless the exceptant meets the burden of overcoming the presumption of the validity of the sale by showing that the omission was prejudicial to the sale of the property at a fair and adequate sum and that a resale would be likely to produce a greater amount, *Brooks v. Bast, supra, Hardy v. Gibson*, 213 Md. 493, 133 A. 2d 401 (1957), *Sawyer v. Novak*, 206 Md. 80, 110 A. 2d 517 (1955), *Preske v. Carroll, supra."*

Jackson failed to show that the sale price was unfair or inadequate and the record is devoid of any evidence that a resale would be likely to produce a greater amount.

## II.

There were facts and circumstances which should have suggested to Townshend that it might be necessary to offer the parcels separately or that the matter ought to be looked into, at least. To begin with the advertisement recites that *two parcels* would be sold. They are separately described and specifically distinguished from each other. Each was acquired by the Salters at a different time. Then there is the fact that the statement of the mortgage claim was only $4,896.97 and, since the proceeds of the mortgage loan were used to buy Parcel No. 2, Townshend knew that the purchase price (of Parcel No. 2) was something under $6,000. Whether he knew that $7,000 had been paid for Parcel No. 1 in August 1962 is not wholly clear but it is reasonably certain Loyola knew it, assuming both parcels had been appraised before the loan was approved. It should immediately have become apparent that the sale of one or the other of the two parcels might bring enough to satisfy the mortgage debt and pay all expenses. For all Townshend knew an inspection of the property might have disclosed substantial im-

provements; in fact, some improvements had been made. Another circumstance which should have suggested caution was Jackson's efforts to bring the monthly payments to date before the sale. Perhaps the most significant fact was Townshend's discovery about two weeks before the sale that Parcel No. 1 was zoned commercial, whereas Parcel No. 2 was zoned residential.

That Parcel No. 1 was occupied by a going business known as American Auto Body and Paint Shop Townshend learned for the first time when he arrived at the scene to conduct the sale. The auctioneer announced to the three bidders who were present that "the front lots were commercial." Although the residence was the only structure mentioned in the advertisement the sale was conducted in front of the commercial building.

It would have been a very simple matter to have offered each parcel separately. If Parcel No. 1 had brought enough to satisfy the mortgage claim and pay the costs and expenses it would, of course, have been unnecessary to offer Parcel No. 2. If the high bid for Parcel No. 2 had been sufficient there would have been no point in offering Parcel No. 1. If the bid for neither had been sufficient they could then have been sold together. Townshend points out that the mortgage provides (in the fine print) that "the property as a whole may be sold, and it shall not be the duty of the party selling to sell the same in parts or lots, but such party may do so." We do not think, however, that such a provision abrogates the basic obligation of the attorney or assignee to act pursuant to the long established equitable principles governing the conduct of persons in a fiduciary relationship to others. *Ex Parte Aurora Fed. Sav. & Loan Assoc.,* 223 Md. 135, 162 A. 2d 739 (1960).

> In 37 Am. Jur., *Mortgages,* § 621, the general rule is stated: "Thus, the general rule is that mortgaged property which consists of several distinct known lots, parcels, or tracts shall be first offered for sale in parcels, *especially where the debtor requests that such a mode of sale be adopted,* or the decree directs the sale of land or so much thereof as is necessary to pay the debt. But this rule, while a wholesome one, is not an arbitrary

one, and should not be enforced where there is a valid reason for a sale of property en masse; as, for example, where the latter mode will insure the best prices and be most advantageous to all parties concerned, or where the separate parcels are used as one property and all are essential to such use, or where the property is first offered in parcels and no bids are received or those received are insufficient to pay the mortgage debt.

"Generally, where the mortgaged property is divided or is divisible, only so much of it should be sold as will satisfy the mortgage debt." (Emphasis supplied.)

But Townshend argues that his failure to offer the parcels separately does not matter since the sale price, $12,100, was not inadequate. While we must agree, in the context here prevailing, that the sale price was adequate, we stop short of saying that adequacy of price, per se, is a handy panacea to be relied upon in any circumstance and in all seasons. Certainly a mortgagor should not have thrust upon him the liquidation of all of the mortgaged property, despite the adequacy of the sale price, when the satisfaction of the mortgage debt can be accomplished, without undue inconvenience, by the sale of any part or parts thereof susceptible of being separately offered and sold, provided, of course, the mortgagor can meet the burden of showing that the manner of sale was, in fact, prejudicial. *Mays v. Lee,* 100 Md. 227, 59 Atl. 848 (1905).

In *Webster v. Archer,* 176 Md. 245, 4 A. 2d 434 (1939), it was said:

"The mere fact that mortgaged property which is divisible is sold as a whole rather than by parcels is not itself evidence sufficient to justify annulment of the sale, but in addition to that *it must appear that that method of selling it was prejudicial to the mortgagor, his privies, or creditors, and the burden of showing that is upon one attacking the sale.* Unless the precise method of sale is prescribed by contract or decree, some discretion is necessarily granted to the trustee, attorney, or assignee, making the sale, as to the manner in which the property will be offered. That discre-

tion will naturally be affected by the character and location of the property and other circumstances peculiar to the case, so that it is impossible to lay down a hard and fast rule that divisible property must under all circumstances be sold in parts." (Emphasis supplied.) *Id.* at 254-55.

We are not persuaded that Jackson has sustained the burden imposed upon him by *Webster, supra.* Even if we make the unlikely assumption that he first learned of the impending sale on 18 July, the day before the sale was scheduled, there was still sufficient time to ask Townshend to offer the parcels separately. There is nothing here to show this was done nor is there anything to suggest Townshend would have refused such a request. In *Mays v. Lee, supra,* where the order setting the sale aside was affirmed, "[t]he *evidence as set out in the record show[ed]*, that the Michael farm alone, if the property had been sold as separate farms, would have sold for a sufficient sum to have paid the debt and the expenses of sale." (Emphasis supplied.) 100 Md. at 229. There is nothing in this record, rising above the level of inference or conjecture, to show that either of the two parcels, had they been offered separately, would have generated a bid sufficient to pay the debt and the expenses.

It occurs to us, moreover, that Jackson's course of action was singularly inept. While he did not attend the sale himself, his attorney was present with instructions to participate in the bidding. Jackson was asked, at the hearing, what he instructed his attorney to do at the sale, but he refused to say, claiming a "confidential relationship between attorney and client." We know only that his attorney made several bids. What they were and why he did not go on to become the purchaser we can only speculate. It well could have been that his attorney forced the price up to a predetermined level and then quit. Such an approach, if true, was surely irrational especially in light of the fact that the only risk involved in going on to become the high bidder would have been the ensuing increase in Townshend's commissions, and, perhaps, a higher fee for the auctioneer, either or both of which he might later have persuaded the court to reduce. In this connection it should be recalled that, two days

after the sale, Jackson offered to pay the mortgage debt and expenses. If he was, in fact, able to do that then it is likely he could have fulfilled any commitment his attorney might have made at the sale. The notion persists that Jackson's complaint is an afterthought. Certainly if we require the attorney making the sale to exercise the same degree of judgment and prudence that a careful owner would have adopted in the sale of his own property, *Webster v. Archer, supra* and *Thomas v. Fewster,* 95 Md. 446, 52 Atl. 750 (1902), we can scarcely condone the virtual absence of that same degree of judgment and prudence on the part of the owner. It might be different, of course, if Jackson had been abroad, ill, incompetent or under some disability. Here, however, he had the benefit of counsel from whom he surely received advice since he sent him to the sale to act in his behalf and in accordance with his instructions.

Since there has been no showing of inadequacy of price or other prejudice the order of the trial judge must be affirmed.

*Order affirmed.*
*Costs to be paid by the appellant.*