PAS REALTY, INC. *v.* RONALD G. RAYNE, Assignee
For
Equitable Trust Company, Successor to
Truckers & Savings Bank

[No. 1388, September Term, 1979.]

*Decided September 5, 1980.*

The cause was argued before THOMPSON, J., and CLAYTON
C. CARTER, Associate Judge of the Second Judicial Circuit
and M. ALBERT FIGINSKI, Associate Judge of the Eighth Judi-
cial Circuit, specially assigned.

*Henry M. Rutledge,* with whom were *Adkins, Potts &
Smethurst* on the brief, for appellant.

*Donald C. Davis,* with whom were *Perdue, Owrutsky,
Rayne & Davis, P.A.* on the brief, for appellee.

FIGINSKI, J., delivered the opinion of the Court.

This is an appeal from the Circuit Court for Wicomico County where, after a hearing, appellant's exceptions to the foreclosure sale of two parcels of land [1] were overruled and, thereafter, an order ratifying the foreclosure sale was entered. Appellant, PAS Realty, Inc., frames a single issue on appeal, i.e., whether the chancellor applied an improper test to determine whether the foreclosure sale should be ratified. Having framed that issue, however, appellant proceeded to challenge the ratification of the foreclosure sale on several distinct grounds, namely, (a) the method of advertising, (b) the alleged chilling impact of a statement distributed at the sale, and (c), at bottom, a claimed inadequacy of sales price because, it is argued, the sale was for a million dollars less than fair market value. Appellant argues that together these factors should have caused the chancellor to refuse to ratify the sale.

It is clear that the purchaser at foreclosure, Equitable Trust, is the successor in interest to the mortgagee. The presumption in favor of the validity of a judicial sale and the burden on the exceptant to establish to the contrary, see, e.g., *Hardy v. Gibson,* 213 Md. 493, 508 (1957), is tempered, therefore, by a clear judicial admonition that:

> "When the purchaser at the foreclosure sale is the mortgagee or his assignee, the Courts will examine the sale closely to determine whether or not it was bona fide and proper. The Courts will set aside such a sale upon 'slight evidence of partiality, unfairness or want of the strictest good faith.'" *So. Maryland Oil v. Kaminetz,* 260 Md. 443, 450 (1971).

Consequently, courts "should exercise a greater degree of caution in passing upon the ratification" of a foreclosure sale to the secured party. *Walton v. Hospital Association,* 178

---

1. The parcels were denominated a parcel "A" and parcel "B" in the notice of sale, and throughout the proceedings below. Both parcels were located in Salisbury, Maryland. Parcel A was vacant land in close proximity to, but separated by Cypress Street from, parcel B which, for the most part, was improved by a shopping center which the testimony below demonstrated was in need of repair, e.g., roof and air conditioning work, as well as parking lot improvements and painting.

Md. 446, 451 (1940). See also, *Walter E. Heller and Co. v. O/S Sonny V.,* 595 F.2d 968, 972, n.2 (5th Cir. 1979). A secured party, however, is not barred as a purchaser at a foreclosure sale; indeed, such party's right to buy in is protected by statute. See § 7-105 (c), Real Property Article, Md. Code; *Hersh v. Allnutt,* 252 Md. 513, 518 (1969).

Both below and here, appellant relied primarily on *Waters v. Prettyman,* 165 Md. 70 (1933). At issue there was the foreclosure sale, and purchase by the secured party, of certain unimproved property in Montgomery County which consisted of "twenty-seven lots, forming the major portion of a town block . . . with water, sewerage, and light connections . . . in close proximity to the line of the District of Columbia . . . and which may be with accuracy termed a city block." 165 Md. at 74-5. The original deed of trust secured payment of $30,000. The purchase price at foreclosure was $5,000. There was a conflict in testimony about the value of the property, but the Court of Appeals reversed the ratification of sale because the lots were offered, in advertisement and at sale, as an entirety and not separately.[2] The Court wrote, 165 Md. at 76:

> "Sound judgment and the protection of the interests of all parties concerned in this case, in our opinion, required that the twenty-seven lots here sold should have been offered separately, rather than as an entirety. It is clear that by so doing the number of potential purchasers would have been increased, for the simple reason that the ability to pay for a single lot would reside in a much larger number of persons interested in a section such as here described, being, as it is, devoted to and owned largely by individual home builders, than those who would be in a position to purchase the entire twenty-seven lots and comply with the terms of sale. The method of advertising and selling here

---

2. There can be no complaint here on this account because the two parcels were offered both separately and together, with the sale being made by the method which brought the highest price at the courthouse door.

employed is not conducive to the property producing the largest price, in which all of those having an interest were vitally concerned. This coupled with a conflict of testimony as to the market value, in which the testimony as to the sale price being grossly inadequate largely predominates, required the chancellor to sustain the exceptions and set the sale aside. There was error in his not so doing."

It is clear, however, that the Court's careful scrutiny of the secured party's purchase was activated by the "predominate" testimony that the sales price was grossly inadequate. Indeed, the Court of Appeals prefaced its discussion of the method of advertisement and sale, thusly (165 Md. at 74):

"It is settled law of this state that inadequacy of price, standing alone, is no ground for the refusal to ratify a mortgage sale, unless the price be so grossly inadequate as to, in and by itself, indicate mistake, fraud, or unfairness in the conduct of the sale. [Citations omitted.]

It is equally well settled that, if inadequacy of price be coupled with any irregular or faulty advertisement or conduct in the making or manner of sale, such as indicates that the property has not been advertised or offered for sale, or sold, under conditions and circumstances that would most likely produce the largest revenue, the court will set it aside and order a resale. The test is: Was the property sold under such conditions and terms as to advertisement and otherwise, as a prudent and careful man would employ, seeking to obtain the best price for his own property?"

The threshold issue, therefore, is the adequacy of the sales price. If it is grossly inadequate, that alone may indicate partiality or unfairness. See *So. Maryland Oil v. Kaminetz, supra.* If, on the other hand, the price is inadequate and there is, additionally, faulty advertisement or conduct of the sale, the sale should be set aside.

We look, carefully, at the record here to scrutinize the price brought at the foreclosure sale. The effective sales price was $1,685,215.00, determined by the $52,000 produced at the sale, and a first mortgage of $889,371.00 and second mortgage of $743,844.00. Appellant presented the testimony of Grayson Winterbottom, a real estate appraiser for the State of Maryland, to establish the fair market value of the parcels. Winterbottom's testimony, premised upon tax assessment records and a market approach, is the basis for appellant's argument that the sale brought more than one million dollars less than fair market value. Mr. Winterbottom prefaced his testimony by acknowledging that there are three recognized methods of determining market value. On cross-examination, moreover, he admitted that the market approach he used requires comparable sales and that the one sale in Salisbury he reviewed was not typical to the shopping center parcel at issue here. Further, and critically, on cross-examination, he testified that the income approach to valuation of commercial property was the "preferable method" and, assuming a relevant cash flow of $180,000.00, the fair market value of the shopping center would be in "the range of $1.5 million."[3] Similarly, testimony produced by appellee placed a $1.5 million valu-

---

3. The record reveals the following cross-examination of Mr. Winterbottom (E. 38-39):

"Q. Would you agree with respect to this particular property [i.e., the shopping center parcel] that the income approach is a preferable method of determining fair market value, rather than the cost approach or the market approach?

A. Yes.

\* \* \*

Q. Now, if you were to assume that the cash flow on this property prior to servicing any mortgage obligations was $180,000.00, using the capitalization rate that you just testified to, what would be the fair market value of this property based on the income approach?

A. Dividing by .12 or .13. \* \* \*

Q. Would it sound about right if I told you it would come out to around $1.5 million?

A. That would be the range of it, yes."

In its case below, appellee established, without contradiction in the record that the "net effective income" of the shopping center was "around $180,000.00." (E. 67).

ation on the shopping center parcel by use of the income approach. With respect to the vacant parcel, appellee's expert valued it at $115,000, while Mr. Winterbottom placed a $134,000 valuation on it. Appellee argues that the $1.5 million income approach valuation of the shopping center parcel, when added to the highest valuation of the vacant land, established a fair value of $1,634,000.00. Appellee then argues that this value is $51,215.00 less than the sales price; in other words, appellee argues that the price was greater than one fair valuation of the property.

Guidance is found in *Habib v. Mitchell*, 257 Md. 29 (1970) where the secured party was the only bidder at a foreclosure sale. There, the Court of Appeals wrote (257 Md. at 35):

"Evidence revealed that the mortgagee had obtained two appraisals on the property. One was for $100,800; the other for $57,850. The mortgagee started the bidding at and obtained the property for the latter figure. Appellant contends that the disparity in appraisal figures and the fact that it was the mortgagee who purchased the property are factors which when combined should invalidate the sale.

In general a mere allegation that a purchase price is inadequate will not be enough to invalidate a foreclosure sale. [Citations omitted.] However, when a mortgagee purchases at such a sale the courts will pay special attention to see that he has acted in good faith. [Citation omitted.] The fact that the mortgagee is watched closely does not require him to act inimically to his own interests. There is no evidence that the sale was not properly advertised or that bidding was discouraged. There is no evidence that the sale was attended by any fraud. Good faith does not require him to pay the higher of the two appraisals. In our opinion the chancellor did not abuse his discretion in ratifying the sale."

On the issue of price here, the record below amply

supported the chancellor's conclusion that the sales price was not grossly inadequate. See Rule 1086. This is certainly clear if *Habib v. Mitchell* is a guide, and we believe it is. The price here exceeded a valuation credited, on cross-examination, as preferable by appellant's own expert. The existence of a higher valuation and the fact that a secured party was the purchaser causes us to go further and seek to determine if there was improper advertising or discouragement of bidding, two factors mentioned in *Habib v. Mitchell, supra,* as being absent there. Here, appellant argues that advertisement in the Salisbury Times was insufficient, asserting a wider media approach was necessary to stimulate response to the sale. Appellant ignores, first, that Rule W74a2 (b) requires publication only in a county newspaper; second, that the record reflects that steps were taken to contact personally at least three prospective buyers outside the immediate geographic area; third, that no mention of wider advertisement was made prior to sale so that other advertising could have been considered and placed; and, fourth, that the record is devoid of any proof that the method of advertisement discouraged potential purchasers.[4] On the facts here, we cannot find that the advertisement was improper.[5]

Appellant claims that bidding was discouraged because at sale there was distributed a "Statement to Prospective Purchasers" which stated as to a second mortgage that "the mortgage is in default and under the terms of the mortgage ... the entire mortgage debt is due and demandable. The mortgage holder has not agreed to a reinstatement of the mortgage." No evidence was presented to show either that the statement was untrue or that any purchaser's interest in the property was chilled. We agree with the chancellor who opined, at the close of the case, that the distributed statement "was a statement of fact" and "that any

---

4. Appellant also contended that the cancellation, rescheduling and advertisement thereof was an inhibiting factor. It is apparent that the rescheduling was necessary to comply with the relevant Maryland Rules of Procedure. In fact, the assignee appeared, according to the record, at the time and place of the initially set sale and no potential purchasers appeared.

5. *de Tamble v. Adkins,* 210 Md. 414, 420, 425 (1956), by inference at least, does not require advertisement beyond that required in the Rules.

prospective purchaser should have made arrangements" for refinancing. Indeed, it would be a curious type of investor who would attend a sale of property subject to more than $1.6 million of prior, open, defaulted mortgages who would not have been either in contact with the secured parties to work out refinancing or prepared to make other financial arrangements.

Here, we cannot hold that the sale price was grossly inadequate, that the advertisement was improper or that the conduct of sale showed partiality or unfairness. Having looked carefully at the record, we affirm.

*Judgment affirmed.*
*Cost to be paid by appellant.*